CITY OF NORWOOD, APPELLEE, *v.* HORNEY ET AL., APPELLANTS. (TWO CASES.)

CITY OF NORWOOD, APPELLEE, *v.* GAMBLE ET AL., APPELLANTS. (TWO CASES.)

[Cite as *Norwood v. Horney,* 110 Ohio St.3d 353, 2006-Ohio-3799.]

(Nos. 2005–0227 and 2005–0228—Submitted September 28, 2005—Decided July 26, 2006.)

(Nos. 2005–1210 and 2005–1211—Submitted January 11, 2006—Decided July 26, 2006.)

**354**

O'CONNOR, J.

{¶ 1} In case Nos. 2005–1210 and 2005–1211, we decide the constitutionality of a municipality's taking of an individual's property by eminent domain and transferring the property to a private entity for redevelopment. In doing so, we must balance two competing interests of great import in American democracy: the individual's rights in the possession and security of property and the sovereign's power to take private property for the benefit of the community.

{¶ 2} In case Nos. 2005–0227 and 2005–0228, we determine the constitutionality of the provision in R.C. 163.19 prohibiting a court from enjoining the taking and using of property appropriated by the government and transferred to a private party for redevelopment, after the compensation for the property has been deposited with the court but prior to appellate review of the taking.

{¶ 3} Our consideration does not take place in a vacuum. We recognize that eminent domain engenders great debate.[1] Its use, though necessary, is fraught with great economic, social, and legal implications for the individual and the community. See, generally, Keasha Broussard, Social Consequences of Eminent

---

1. The court acknowledges with appreciation the briefs provided by amici curiae.

Domain: Urban Revitalization Against the Backdrop of the Takings Clause (2000), 24 Law & Psychology Rev. 99.

{¶ 4} Appropriation cases often represent more than a battle over a plot of cold sod in a farmland pasture or the plat of municipal land on which a building sits. For the individual property owner, the appropriation is not simply the seizure of a house. It is the taking of a home—the place where ancestors toiled, where families were raised, where memories were made. Fittingly, appropriations are scrutinized by the people and debated in their institutions.

{¶ 5} In reviewing an appropriation similar to that at issue here, a sharply divided United States Supreme Court recently upheld the taking over a federal Fifth Amendment challenge mounted by individual property owners. *Kelo v. New London* (2005), 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439. Although it determined that the Federal Constitution did not prohibit the takings, the court acknowledged that property owners might find redress in the states' courts and legislatures, which remain free to restrict such takings pursuant to state laws and constitutions.

{¶ 6} In response to that invitation in *Kelo*, Ohio's General Assembly unanimously enacted 2005 Am.Sub.S.B. No. 167. The legislature expressly noted in the Act its belief that as a result of *Kelo*, "the interpretation and use of the state's eminent domain law could be expanded to allow the taking of private property that is not within a blighted area, ultimately resulting in ownership of that property being vested in another private person in violation of Sections 1 and 19 of Article I, Ohio Constitution." Section 4(A), 2005 Am.Sub.S.B. No. 167. The Act created a task force to study the use and application of eminent domain in Ohio and imposed "a moratorium on any takings of this nature by any public body until further legislative remedies may be considered." [2] Id.

{¶ 7} We now turn to the cases pending before us, which raise social and legal issues similar to those in *Kelo*.

{¶ 8} The appellants' property was appropriated by the city of Norwood after the city determined that the appellants' neighborhood was a "deteriorating area," as that term is defined in the provisions governing appropriations in the Codified Ordinances of the City of Norwood ("Norwood Code"). Although, as we shall discuss below, we have held that a city may take a slum, blighted, or deteriorated property for redevelopment, *State ex rel. Bruestle v. Rich* (1953), 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778, and suggested that the taking is proper even when the city transfers the appropriated property to a private party for redevelopment, *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 553 N.E.2d 597, we have never been asked whether a city may

---

2. The moratorium expires on December 31, 2006. Section 2(A), 2005 Am.Sub.S.B. No. 167.

appropriate property that the city determines is in an area that may deteriorate in the future.

{¶ 9} We hold that although economic factors may be considered in determining whether private property may be appropriated, the fact that the appropriation would provide an economic benefit to the government and community, standing alone, does not satisfy the public-use requirement of Section 19, Article I of the Ohio Constitution.

{¶ 10} We also hold that the void-for-vagueness doctrine applies to statutes that regulate the use of eminent-domain powers. Courts shall apply heightened scrutiny when reviewing statutes that regulate the use of eminent-domain powers. Applying that standard, we hold that Norwood's use of "deteriorating area" as a standard for appropriation is void for vagueness. We further hold that the use of the term "deteriorating area" as a standard for a taking is unconstitutional because the term inherently incorporates speculation as to the future condition of the property to be appropriated rather than the condition of the property at the time of the taking.

{¶ 11} Finally, we hold that the provision in R.C. 163.19 that prohibits a court from enjoining the taking and using of property appropriated by the government after the compensation for the property has been deposited with the court but prior to appellate review of the taking violates the separation-of-powers doctrine and is therefore unconstitutional. We further hold that the unconstitutional portion of R.C. 163.19 can be severed from the rest of the statute, and, accordingly, the remainder of the statute remains in effect.

## I. RELEVANT BACKGROUND

### A

### *Norwood and Its Denizens*

{¶ 12} The city of Norwood is a modern urban environment. Surrounded by the city of Cincinnati, Norwood was once home to several manufacturing plants and businesses that provided a substantial tax base for the municipality. Despite that industrial component, Norwood was, and for many remains, a desirable place to live. Norwood's neighborhoods were composed of traditional single-family houses and duplexes that provided homes to generations of families and many individuals.[3]

---

3. Appellants Carl and Joy Gamble had lived in the neighborhood for over 35 years before the appropriation. They raised their children there and planned to live the rest of their lives there. Appellants Joseph P. Horney and his wife, Carol Gooch, once lived in the neighborhood and, though now residing elsewhere, owned and operated rental properties in the neighborhood before the appropriation.

{¶ 13} Over the past 40 years, however, Norwood underwent many changes. Like many municipalities in Ohio, Norwood's industrial base eroded, taking with it tax dollars vital to the city. Municipal jobs and many services were eliminated, and the city is millions of dollars in debt. Though the financial outlook of Norwood has been altered greatly over the years, perhaps the most significant change for our purposes here is the physical nature of the city itself.

{¶ 14} In the 1960s, property was appropriated from the appellants' neighborhood and used in the construction of a major highway—Interstate 71—through Cincinnati. In the neighborhoods affected, numerous homes were razed and front yards diminished in order to make way for the access roads and ramps to the highway. The streets became busier, creating safety problems for residents who had to back onto busy roadways from their driveways. Residential roads that once ran between major thoroughfares were bisected by the new highway, creating dead-end streets.

{¶ 15} Over time, businesses arose in places where houses once stood. The neighborhood became less residential and more commercial. Other changes in the neighborhood's character followed. Traffic increased dramatically due to motorists seeking the highway and businesses in the area. Noise increased, and light pollution became more prevalent.

{¶ 16} The parties vehemently disagree as to the extent to which these changes adversely affected the physical functionality, aesthetic appeal, and quality of living in the neighborhood. There is no disagreement, however, that the property held commercial value and that the proposed plan for development would raise money for the city.

{¶ 17} A private, limited-liability company, Rookwood Partners, Ltd. ("Rookwood"), entered discussions with Norwood about redeveloping the appellants' neighborhood. The preliminary plans for the development call for the construction of more than 200 apartments or condominiums and over 500,000 square feet of office and retail space (all of which would be owned by Rookwood), as well as two large public-parking facilities (which would be owned by Norwood) with spaces for more than 2,000 vehicles. The city expects the redeveloped area to result in nearly $2,000,000 in annual revenue for Norwood.

{¶ 18} Norwood, operating with a deficit, was unable to fix the problems or redevelop the appellants' neighborhood on its own, and thus city council was interested in the project. Discussions between Norwood and Rookwood culminated in a redevelopment contract in which Rookwood agreed to reimburse the city for the expenses of the project, including the costs arising from any need to use eminent domain to appropriate the property necessary for the project.

{¶ 19} Rookwood preferred that Norwood acquire the property needed for the project through eminent domain, but Norwood resisted. It encouraged Rook-

wood to purchase the property through voluntary sales of homes and businesses, without the city's intervention.

{¶ 20} Rookwood was largely successful; it secured acquisition agreements from a substantial majority of the owners of the property necessary to complete the project. The appellants, however, refused to sell.

{¶ 21} Because the appellants refused to sell their property, Rookwood asked Norwood to appropriate the appellants' properties and transfer them to Rookwood. Rookwood, in turn, agreed to raze the existing structures (including the appellants' homes), reconfigure the streets, and redevelop the area.

## B

### *The Takings*

{¶ 22} Pursuant to the Norwood Code, an urban-renewal study must be completed before the city can institute eminent-domain proceedings.[4] Norwood used funds provided by Rookwood to retain a consulting firm, Kinzelman Kline Grossman ("KKG"), to prepare an urban-renewal study of the appellants' neighborhood. The study concluded that the construction of I–71 and ensuing conversion of residential and industrial properties to commercial use had led to significant, negative changes in Norwood. Despite acknowledging that many homes were in fair to good condition, KKG concluded that the neighborhood was a "deteriorating area" as that term is defined in the Norwood Code.[5] KKG

---

4. Chapter 163 of the Norwood Code is entitled "Urban Renewal" and governs Norwood's appropriations for purposes of urban renewal. Pursuant to the Norwood Code, the city may engage a study of an area in order to determine whether redevelopment is needed. Norwood Code 163.04 and 163.05. The study is a preliminary step in the appropriation process. It may serve as a predicate to an urban-renewal plan, which in turn is considered along with other information, including resident input at public hearings on the matter, by the city planning commission and city council to determine whether appropriation is warranted. Id. at 163.03 through 163.09.

5. {¶ a} Norwood Code 163.02(b) defines "[s]lum, blighted or deteriorated area" as "an area * * * in which there are a majority of structures or other improvements, which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, unsafe and unsanitary conditions or the existence of conditions which endanger life or property by fire or other hazards and causes, or any combination of such factors, and an area with overcrowding or improper location of structures on the land, excessive dwelling unit density, detrimental land uses or conditions, unsafe, congested, poorly designated streets or inadequate public facilities or utilities, all of which substantially impairs the sound growth and planning of the community, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime, and is detrimental to the public health, safety, morals and general welfare."

{¶ b} Norwood Code 163.02(c) defines "deteriorating area" as "an area, whether predominantly built up or open, which is not a slum, blighted or deteriorated area but which, because of incompatible land uses, nonconforming uses, lack of adequate parking facilities, faulty street

further determined that the neighborhood would continue to deteriorate and that there would be "continuing piecemeal conversion" of residences to businesses that could be detrimental to the area.

{¶ 23} After public hearings and town meetings were held and the local planning commission recommended approval of the redevelopment plan, Norwood City Council passed a series of ordinances adopting the plan and authorizing the mayor to enter the redevelopment agreement with Rookwood and to appropriate the appellants' property. The city then filed complaints against the appellants to appropriate their properties.

{¶ 24} At trial, Norwood relied on the testimony of KKG employees to support its conclusion that the appellants' neighborhood was deteriorating. KKG employees testified that the neighborhood was not a slum, blighted, or deteriorated area as that term is defined in the Norwood Code. The trial court found that the critical evidence presented by Norwood conflicted as to the conclusions to be drawn about the neighborhood. In her findings of fact, the trial judge noted that although one KKG witness opined that the neighborhood was blighted and in a deteriorating condition, he also admitted that the area was not a deteriorated area as that term is defined by the Norwood Code. The trial judge also found that another KKG witness testified that the neighborhood was neither a slum nor blighted or deteriorated and was not on its way to becoming blighted and that he could not conclude that the neighborhood was conducive to ill health, transmission of disease, or juvenile delinquency and crime, or that it was detrimental to public health, safety, morals or general welfare. He testified that he believed that at best, the neighborhood was deteriorating as a single-family-residence neighborhood and that the quality of life of the neighborhood's residents was decreasing. The trial judge similarly found that Norwood's planning director testified only that the neighborhood "probably would" deteriorate or was in danger of deteriorating into a blighted area.

{¶ 25} After a hearing that lasted several days, the trial court rendered findings of fact and conclusions of law regarding whether the taking was lawful. The court found that KKG's study of the neighborhood contained numerous flaws and errors. Although the court did not enumerate all of the flaws and errors, it specifically noted that KKG had counted several negative factors twice, erroneously included factors that should not have been considered, and improperly

---

arrangement, obsolete platting, inadequate community and public utilities, diversity of ownership, tax delinquency, increased density of population without commensurate increases in new residential buildings and community facilities, high turnover in residential or commercial occupancy, lack of maintenance and repair of buildings, or any combination thereof, is detrimental to the public health, safety, morals and general welfare, and which will deteriorate, or is in danger of deteriorating, into a blighted area."

conflated the criteria necessary to establish a slum, blighted, or deteriorated area with the mutually exclusive criteria for establishing a deteriorating area. The court found that, despite its errors, KKG's study was not devoid of reliability and validity and that it complied with the Norwood Code. In rejecting the appellants' contention that Norwood had not used sound reasoning in determining that their neighborhood was deteriorating, the court determined that certain conditions in the neighborhood were established beyond dispute, including those related to the increase in traffic, diversity of ownership, the safety issues related to dead-end streets and driveways off busy roads, and incompatible land uses. The court then determined the conclusions to be drawn from those conditions.

{¶ 26} Significantly, the court found that Norwood had abused its discretion insofar as it had found that the neighborhood was a "slum, blighted or deteriorated area." That conclusion was based on the paucity of evidence supporting the necessary finding that a "majority of structures" in the neighborhood were conducive to ill health and crime, detrimental to the public's welfare, or otherwise satisfied the criteria of a slum, blighted, or deteriorated area. The court concluded, however, that there was no showing that Norwood had abused its discretion in finding that the neighborhood was a "deteriorating area."

{¶ 27} The latter conclusion seems to have been driven by the deferential standard that the trial court believed it was required to use in evaluating Norwood's conclusion:

{¶ 28} "The issue is whether [Norwood] abused its discretion in finding that the area was in danger of deteriorating into a blighted area. The Court does not need to conclude that it would reach the same judgment as Norwood, but only that there was a sound reasoning process and that Council did not abuse its discretion. The Court finds that this is a more difficult issue [than the issue of whether the neighborhood was a slum, blighted, or deteriorated area]. On the one hand, it is undisputed that all the buildings in the area are in good to fair condition, generally well maintained with no tax delinquencies, none were 'dilapidated,' and none were 'obsolete.' The KKG principal responsible for the [Urban–Renewal] Plan concluded that the area was not in danger of deteriorating into a blighted area. He did testify that the area was deteriorating as a single family neighborhood; however, this is not the test. The area must be in danger of deteriorating into a blighted area. On the other hand, it is undisputed that there are safety issues and traffic concerns causing unsafe conditions (especially with dead-end streets with little or no turnaround for emergency vehicles), a predominance of inadequate street layout, faulty lot layout, and diversity of ownership, which in combination are in the City Council's judgment causing the area to be deteriorating. There was evidence that the conditions could lead to impairment of sound growth, an economic liability and a menace to the public welfare. The

Planning Director for the City testified that the area was in danger of deteriorating into a blighted area. The other KKG witness also testified that the area was in danger of deteriorating into a blighted area.

{¶ 29} *"Judicial deference to City Council's decisions is required because in our system of government, legislatures are better able to assess what public purpose should be advanced by the exercise of eminent domain."* (Emphasis added and footnote deleted.)

{¶ 30} Having found that the taking was justified because of the deteriorating condition of the neighborhood, the trial court returned the causes (which had been consolidated) to their originally assigned judges to hold trials on the issue of compensation. After the juries rendered their verdicts on the value of appellants' properties, Norwood deposited with the court the full amount awarded in each valuation action. Norwood obtained the titles to the properties and transferred them to Rookwood, which began demolishing the houses in the neighborhood.

{¶ 31} The trial court refused to enjoin Rookwood from using or damaging the property pending appeal, and a divided court of appeals denied a stay of the trial court's judgment, finding that R.C. 163.19 prohibited such relief. *Norwood v. Horney* (Jan. 19, 2005), 1st Dist. No. C–040683; *Norwood v. Gamble* (Jan. 19, 2005), 1st Dist. No. C–040783. Upon appeal of those rulings, we accepted the causes and issued orders preventing the appellees from destroying or otherwise altering the properties pending our review of the taking. 105 Ohio St.3d 1445, 2005-Ohio-669, 822 N.E.2d 1261; 106 Ohio St.3d 1524, 2005-Ohio-5223, 835 N.E.2d 375; 105 Ohio St.3d 1559, 2005-Ohio-2447, 828 N.E.2d 115.

{¶ 32} With this background in mind, we turn to the law relevant to these cases.

## II. Constitutional Considerations

{¶ 33} "Wherever there is sovereignty, whether in the old world, where it is held in trust for the people by things called kings, or in this country where the people wear it upon their own shoulders, two great and fundamental rights exist. The right of eminent domain in all the people, and the right of private property in each. These great rights exist over and above, and independent of all human conventions, written and unwritten." *Proprietors of the Spring Grove Cemetery v. Cincinnati, Hamilton & Dayton RR. Co.* (Super.1849), 1 Ohio Dec. Reprint 316, reversed on other grounds (Ohio 1850), 1 Ohio Dec. Reprint 343.

### A

### *Individual Property Rights*

{¶ 34} The rights related to property, i.e., to acquire, use, enjoy, and dispose of property, *Buchanan v. Warley* (1917), 245 U.S. 60, 74, 38 S.Ct. 16, 62 L.Ed. 149,

are among the most revered in our law and traditions. Indeed, property rights are integral aspects of our theory of democracy and notions of liberty. See, e.g., Robert Meltz, Dwight H. Merriam, and Richard M. Frank, The Takings Issue: Constitutional Limits on Land Use Control and Environmental Regulation (1999) 10; Bernard H. Siegan, Property and Freedom: The Constitution, the Courts, and Land–Use Regulation (1997) 14–18; The Private Use of Public Power: The Private University and the Power of Eminent Domain (1974), 27 Vand.L.Rev. 681, 683, and fn. 1.

{¶ 35} Believed to be derived fundamentally from a higher authority and natural law, property rights were so sacred that they could not be entrusted lightly to "the uncertain virtue of those who govern." *Parham v. Justices of Decatur Cty. Inferior Court* (Ga.1851), 9 Ga. 341, 348. See, also, *Bank of Toledo v. Toledo* (1853), 1 Ohio St. 622, 664; *Proprietors of Spring Grove*, 1 Ohio Dec. Reprint 316; Joseph J. Lazzarotti, Public Use or Public Abuse (1999), 68 U.M.K.C.L.Rev. 49, 54; J.A.C. Grant, The "Higher Law" Background of the Law of Eminent Domain (1932), 6 Wisc.L.Rev. 67. As such, property rights were believed to supersede constitutional principles. "To be * * * protected and * * * secure in the possession of [one's] property is a right inalienable, a right which a written constitution may recognize or declare, but which existed independently of and before such recognition, and which no government can destroy." *Henry v. Dubuque Pacific RR. Co.* (1860), 10 Iowa 540, 543. As Chief Justice Bartley eloquently described more than 150 years ago:

{¶ 36} "The right of private property is an *original* and *fundamental* right, existing anterior to the formation of the government itself; the civil rights, privileges and immunities authorized by law, are *derivative*—mere *incidents* to the political institutions of the country, conferred with a view to the public welfare, and therefore *trusts* of civil power, to be exercised for the public benefit. * * * Government is the necessary burden imposed on man as the only means of securing the protection of his rights. And this protection—the primary and only legitimate purpose of civil government, is accomplished by protecting man in his rights of personal security, personal liberty, and private property. The right of private property being, therefore, an *original right,* which it was one of the primary and most sacred objects of government to secure and protect, is widely and essentially distinguished in its nature, from those exclusive political rights and special privileges * * * which are created by law and conferred upon a few * * *. The fundamental principles set forth in the bill of rights in our constitution, declaring the inviolability of private property, * * * were evidently designed to protect the right of private property as one of the primary and original objects of civil society * * *." (Emphasis sic.) *Bank of Toledo,* 1 Ohio St. at 632.

{¶ 37} In light of these Lockean notions of property rights, see, e.g., Richard A. Epstein, Takings: Private Property and the Power of Eminent Domain (1985) 10–18, it is not surprising that the founders of our state expressly incorporated individual property rights into the Ohio Constitution in terms that reinforced the sacrosanct nature of the individual's "inalienable" property rights, Section 1, Article I,[6] which are to be held forever "inviolate." Section 19, Article I. See, also, Section 5, Article XIII; Sections 4, 10, and 11, Article XVIII (requiring compensation for municipal appropriations of private property for public rights of way, utilities, and improvements).

{¶ 38} Ohio has always considered the right of property to be a fundamental right. See, e.g., *Reece v. Kyle* (1892), 49 Ohio St. 475, 484, 31 N.E. 747, overruled in part on other grounds, *Mahoning Cty. Bar Assn. v. Ruffalo* (1964), 176 Ohio St. 263, 27 O.O.2d 161, 199 N.E.2d 396; *Hatch v. Buckeye State Bldg. & Loan Co.* (P.C.1934), 32 Ohio N.P. (N.S.) 297, 16 Ohio Law Abs. 661; *In re Vine St. Congregational Church* (C.P.1910), 20 Ohio Dec. 573; *Caldwell v. Baltimore & Ohio Ry. Co.* (C.P.1904), 14 Ohio Dec. 375; *Kata v. Second Natl. Bank of Warren* (1971), 26 Ohio St.2d 210, 55 O.O.2d 458, 271 N.E.2d 292. There can be no doubt that the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces.

## B

### The State's Power of Eminent Domain

{¶ 39} Like the individual's right to property, the state's great power to seize private property predates modern constitutional principles. Understood as "the offspring of political necessity," *Kohl v. United States* (1875), 91 U.S. 367, 371, 23 L.Ed. 449, eminent domain is, like the taxation and police powers, *Kimball v. Grantsville City* (1899), 19 Utah 368, 57 P. 1, 2, "an inseparable incident of sovereignty," *Giesy v. Cincinnati, Wilmington & Zanesville RR. Co.* (1854), 4 Ohio St. 308, 323. See, also, *Cooper v. Williams* (1831), 4 Ohio 253, 287 ("by virtue of its transcendent sovereignty (*dominium eminens*), [the state has] a power to appropriate private property for public uses, for the purpose of promoting the general welfare. This power is inherent in every government"). At the time the Constitution was adopted, eminent domain was so familiar that "[i]ts existence * * * in the grantee of that power [was] not to be questioned." *Kohl*, 91 U.S. at 372, 23 L.Ed. 449. The founders recognized the necessity of the takings power and expressly incorporated it into the Fifth Amendment to the

---

6. "All men * * * have certain inalienable rights, among which are those of * * * acquiring, possessing, and protecting property."

United States Constitution. But though its existence is undeniable and its powers are sweepingly broad, the power is not unlimited.

{¶ 40} There is an inherent tension between the individual's right to possess and preserve property and the state's competing interests in taking it for the communal good. Mindful of that friction and the potential for misuse of the eminent-domain power, James Madison's proposed draft of the Takings Clause included two equitable limitations on its use that were eventually incorporated into the Fifth Amendment: [7] the "public use" requirement and the "just compensation" rule. Charles E. Cohen, Eminent Domain after *Kelo v. City of New London:* An Argument for Banning Economic Development Takings (2006), 29 Harv.J.L. & Pub. Policy 491, 532; William B. Stoebuck, A General Theory of Eminent Domain (1972), 47 Wash.L.Rev. 553, 595. The amendment confirms the sovereign's authority to take, but conditions the exercise of that authority upon satisfaction of two conjunctive standards: that the taking is for a "public use" and that "just compensation" for the taking is given to the property owner. *Kelo,* 545 U.S. 469, 125 S.Ct. at 2672, 162 L.Ed.2d 439; *Brown v. Legal Found. of Washington* (2003), 538 U.S. 216, 231–232, 123 S.Ct. 1406, 155 L.E.2d 376.

{¶ 41} Similarly, almost every state constitution eventually included provisions related to eminent-domain powers. Stoebuck, 47 Wash.L.Rev. at 554–555. Both the Northwest Ordinance and the Ohio Constitution [8] recognized the state's right to take property from an individual, but conditioned the right to take on the equitable considerations of just compensation and public use. *State ex rel. Bruestle v. Rich,* 159 Ohio St. at 25–26, 50 O.O. 6, 110 N.E.2d 778; Lazzarotti, 68 U.M.K.C.L.Rev. at 54 (describing the Northwest Ordinance's "pre-constitutional codification of the eminent domain power" that included the limitations of public use and compensation). Section 19, Article I requires that the taking be necessary for the common welfare and, to "insure that principle of natural justice," that the persons deprived of their property will be compensated for "every injury resulting from this act," "every infringement on their [property] rights," and "every injurious interference with the control of their own property." [9] *Cooper,* 4 Ohio at 286 and 287.

---

7. "No person shall be * * * deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

8. "Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure, or for the purpose of making or repairing roads, * * * a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money, and such compensation shall be assessed by a jury * * *." Section 19, Article I, Ohio Constitution.

9. In eminent-domain cases, "just compensation" is that compensation that places the individual in "as good a position pecuniarily as if his property had not been taken," to be "made whole," but no

{¶ 42} The binary constitutional inquiry in an eminent-domain case is whether both the compensation requirement and the public-use tests were satisfied. The issue of compensation is not presented in these appeals, but the latter, more difficult question of "public use" is. See *Kelo,* 545 U.S. 469, 125 S.Ct. at 2673, 162 L.Ed.2d 439 (O'Connor, J., dissenting).

{¶ 43} It is axiomatic that the federal and Ohio constitutions forbid the state to take private property for the sole benefit of a private individual, *O'Neil v. Summit Cty. Bd. of Commrs.* (1965), 3 Ohio St.2d 53, 57, 32 O.O.2d 42, 209 N.E.2d 393; *Vanhorne's Lessee v. Dorrance* (1795), 2 U.S. (2 Dall.) 304, 1 L.Ed. 391, even when just compensation for the taking is provided. *Kelo,* 545 U.S. 469, 125 S.Ct. at 2661, 162 L.Ed.2d 439 ("it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B,* even though *A* is paid just compensation"). See, also, *Prestonia Area Neighborhood Assn. v. Abramson* (Ky.1990), 797 S.W.2d 708, 711 (naked and unconditional government seizure of private property for private use is repugnant to our constitutional protections against the exercise of arbitrary power and fundamental unfairness). A sine qua non of eminent domain in Ohio is the understanding that the sovereign may use its appropriation powers only upon necessity for the common good. *Buckingham v. Smith* (1840), 10 Ohio 288, 297 (eminent domain "is founded on the superior claims of a whole community over an individual citizen; but then in those cases only where private property is wanted for *public use,* or demanded by the *public welfare* " [emphasis sic] ). As we explained in *Cooper,* the exercise of sovereignty in eminent-domain cases is predicated on the notion that such a taking can be permitted only "for the use and benefit of the people," which is "distinct from government interest, profit, or concern." *Cooper,* 4 Ohio at 290. "It is only this great and common benefit to all the people alike that creates a necessity authorizing and justifying the seizure * * *. It is the people's prerogative, exists in the social compact, and is founded in the maxim, '*salus populi suprema est lex.*' " Id.

{¶ 44} Despite such commanding language, however, the concept of public use has been malleable and elusive. As eminent-domain doctrine developed over the years, understanding of the term "public use" often varied greatly, leaving case law in " 'doctrinal and conceptual disarray' " and causing uncertainty for attorneys and jurists. Meltz et al., The Takings Issue, supra, at 8, quoting Andrea Peterson, The Takings Clause: In Search of Underlying Principles: Part I—A

---

more. *Olson v. United States* (1934), 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. Such compensation typically is measured by the fair market value of the physical property at the time of the taking, *United States v. 50 Acres of Land* (1984), 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376, and does not reflect the more elusive, metaphysical value that the property may have to its owner. *United States v. Petty Motor Co.* (1946), 327 U.S. 372, 377, 66 S.Ct. 596, 90 L.Ed. 729.

Critique of Current Takings Law Doctrine (1989), 77 Cal.L.Rev. 1299, 1304; *Nollan v. California Coastal Comm.* (1987), 483 U.S. 825, 866, 107 S.Ct. 3141, 97 L.Ed.2d 677 (Stevens, J., dissenting). Given its fluid nature, it is necessary to consider the evolution of the public-use determinations that dominate the instant cases.

{¶ 45} In America's nascent period, there was an abundance of unclaimed land, limited government activity, and little controversy over the use of eminent domain to develop land and natural resources. The Public Use Limitation on Eminent Domain: An Advance Requiem (1949), 58 Yale L.J. 599, 600; Philip Nichols Jr., The Meaning of Public Use in the Law of Eminent Domain (1940), 20 B.U.L.Rev. 615, 617. Id. When takings occurred, they were rarely believed to be unwarranted. Typically, the appropriation was of obvious necessity and had clear, palpable benefits to the public, as in cases in which the property was taken for roadways and navigable canals, government buildings, or other uses related to the protection and defense of the people. See, e.g., *Cooper*, 4 Ohio at 286–287; *Ferris v. Bramble* (1855), 5 Ohio St. 109, 113; *Rindge Co. v. Los Angeles Cty.* (1923), 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186; *Kohl*, 91 U.S. at 368, 23 L.Ed. 449; Nichols, 20 B.U.L.Rev. at 617, and cases cited therein. In this early period, "public use" was often equated to "public benefit." See, e.g., *McQuillen v. Hatton* (1884), 42 Ohio St. 202; Nichols at 617.

{¶ 46} The early legal authority for the rare challenge to such takings was also circumscribed. Before the Civil War and the adoption of the Fourteenth Amendment, the federal courts held the Fifth Amendment inapplicable to the states. See, e.g., *Barron v. Mayor & Baltimore City Council* (1833), 32 U.S. (7 Pet.) 243, 250–251, 8 L.Ed. 672 (refusing to impose the Fifth Amendment's limitations on eminent domain on the states). Thus, the federal courts did not restrain the states' exercise of eminent-domain powers to take private property.[10]

{¶ 47} Although the takings were occasionally challenged in state courts, only in rare instances did the courts interfere. See, e.g., *Buckingham*, 10 Ohio at 296–297 (limiting the taking of land to what was necessary to accomplish the public benefit). Generally, the state courts upheld the authority for the taking. Nichols, 20 B.U.L.Rev. at 617 and fn. 13.

{¶ 48} As America shifted from an agrarian society to an industrialized and increasingly urban one, the economy grew. Social policy and legal philosophy fed more probing inquiries into the nature, scope, and application of all of the sovereign powers, including eminent domain. The takings doctrine was used

---

10. The federal government did not assert authority to take state lands in its own name until after the Civil War, and the federal courts were not called on to address federal appropriations of state lands until the closing of Reconstruction. See *Kohl*, 91 U.S. at 373, 23 L.Ed. 449.

widely to support the creation of the nation's physical infrastructure and those enterprises necessary for continued expansion and development, such as utilities, railroads, and mines. Though these takings often involved a significant benefit to individuals and individual corporations, many legislatures and courts affirmed their use under the principle that they afforded some larger, general benefit to the public. Wendell E. Pritchett, The "Public Menace" of Blight: Urban Renewal and the Private Uses of Eminent Domain (2003), 21 Yale L. & Policy Rev. 1, 9–10; The Private Use of Public Power, 27 Vand.L.Rev. at 702.

{¶ 49} By the mid–19th century, there was some movement within the state courts to limit broad interpretations of public benefit and to more strongly guard individual property rights. See, e.g., *Pittsburg, Wheeling & Kentucky RR. Co. v. Benwood Iron–Works* (1888), 31 W.Va. 710, 735, 8 S.E. 453 ("We would do nothing to hinder the development of the state, nor to cripple railroad companies in assisting such development, but at the same time we must protect the property rights of the citizens. All that to which the corporations are entitled under a proper construction of the law they will receive; but they must not, for their own gain and profit, be permitted to take private property for private use"); see, also, *Townsend v. Epstein* (1901), 93 Md. 537, 49 A. 629. This retrenchment from former broad readings often required creative evasion of precedent, recasting the takings as an exercise of the police power not related to eminent domain. The Public Use Limitation on Eminent Domain, 58 Yale L.J. at 605; Nichols, 20 B.U.L.Rev. at 617–624.

{¶ 50} By the end of the 19th century, the federal courts had established that the Due Process Clause of the Fourteenth Amendment endowed them with authority to review state takings, see, e.g., *Missouri Pacific Ry. Co. v. Nebraska* (1896), 164 U.S. 403, 417, 17 S.Ct. 130, 41 L.Ed. 489, but they employed broad constructions of "public use" in doing so, particularly when the taking expanded the economy or provided vital resources, as with mining operations or irrigation systems necessary for settlement and development of the western regions. Nichols, 20 B.U.L.Rev. at 623. See, e.g., *Strickley v. Highland Boy Gold Mining Co.* (1906), 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (affirming use of eminent domain to permit a private mining company to run lines for transporting ore over private property); *Clark v. Nash* (1905), 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085 (affirming use of eminent domain to grant a right of way over private land for the enlargement of an irrigation ditch for the benefit of another private individual).

{¶ 51} The broader concept of public use set forth in these cases eventually dominated and became entrenched in early 20th-century eminent-domain jurisprudence. In this view, the fact that an "incidental benefit" flowed to a private actor was not a critical aspect of the analysis (even if that benefit was significant), provided that there was a clear public benefit in the taking. See Nichols, 20

B.U.L.Rev. at 622 and fns. 41–43, citing *Old Dominion Land Co. v. United States* (1925), 269 U.S. 55, 66, 46 S.Ct. 39, 70 L.Ed. 162; *Alabama Power Co. v. Gulf Power Co.* (M.D.Ala.1922), 283 F. 606; *In re Condemnations for Improvement of Rouge River* (E.D.Mich.1920), 266 F. 105. The expansive reading of public use, however, must be understood properly.

{¶ 52} Central to the broad construction of public use was the courts' understanding that any workable definition of public use in an industrial age had to be "capable of meeting new conditions and improvements, and the ever-increasing needs of society." *Tanner v. Treasury Tunnel, Mining & Reduction Co.* (1906), 35 Colo. 593, 595–596, 83 P. 464, citing *Olmstead v. Camp* (1866), 33 Conn. 532, 551. Significantly, the more liberal framing of public use was not a retreat from the fundamental understanding that a taking was not warranted for private benefit alone. As Justice Peckham explained in *Clark:*

{¶ 53} "[W]e do not desire to be understood by this decision as approving of the broad proposition that private property may be taken in all cases where the taking may promote the public interest and tend to develop the natural resources of the state. We simply say that in this particular case, and upon the facts stated in the findings of the court, and having reference to the conditions already stated, we are of the opinion that the use is a public one, although the taking of the right of way is for the purpose simply of thereby obtaining the water for an individual, where it is absolutely necessary to enable him to make any use whatever of his land, and which will be valuable and fertile only if water can be obtained. Other landowners adjoining the [beneficiary of the taking], if any there are, might share in the use of the water by themselves taking the same proceedings to obtain it, and we do not think it necessary, in order to hold the use to be a public one, that all should join in the same proceeding, or that a company should be formed to obtain the water." 198 U.S. at 369–370, 25 S.Ct. 676, 49 L.Ed. 1085.

{¶ 54} Thus, rather than forging a new notion of public use, *Clark* is more properly seen as an extension of the court's decision in *Fallbrook Irrigation Dist. v. Bradley* (1896), 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369, which found sufficient public use in a taking that granted a private corporation land to create reservoirs and ditches to supply landowners with water.

{¶ 55} The doctrinal evolution of eminent domain thus reflects judicial understandings that the public-use test required flexibility and consideration of diverse local conditions rather that rigid, uniform application. See, e.g., *Pontiac Improvement Co. v. Bd. of Commrs. of Cleveland Metro. Park Dist.* (1922), 104 Ohio St. 447, 460, 135 N.E. 635; *Rindge Co.,* 262 U.S. at 705–706, 43 S.Ct. 689, 67 L.Ed. 1186. See, also, *Clark,* 198 U.S. at 370, 25 S.Ct. 676, 49 L.Ed. 1085 (describing differences in the rights of riparian owners in the eastern and western regions of the country). This acceptance of the need for an elastic

standard in considering public use became widely ingrained and was fully adopted by this court by midcentury. See, e.g., *State ex rel. Gordon v. Rhodes* (1951), 156 Ohio St. 81, 91–92, 45 O.O. 93, 100 N.E.2d 225, quoting 37 American Jurisprudence (1941) 734, Municipal Corporations, Section 120 (" 'A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. * * * The modern trend of decision is to expand and liberally construe the term "public use" in considering state and municipal activities' "); *State v. Buckley* (1968), 16 Ohio St.2d 128, 132, 45 O.O.2d 469, 243 N.E.2d 66 ("concepts of police power change with the times").

{¶ 56} While broad conceptualizations of public use evolved during the first decades of the 20th century, civic and government leaders became increasingly concerned with living conditions in urban areas and the array of social problems caused by the lack of adequate and safe, affordable housing in cities. The federal government eventually enacted sweeping legislation in an attempt to ameliorate some of those concerns. See, generally, *State ex rel. Ellis v. Sherrill* (1940), 136 Ohio St. 328, 331–332, 16 O.O. 464, 25 N.E.2d 844; *Sayre v. United States* (N.D.Ohio 1967), 282 F.Supp. 175, 187–188 (describing federal urban-renewal funding statutes); *State ex rel. Allerton Parking Corp. v. Cleveland* (1965), 4 Ohio App.2d 57, 67–68, 33 O.O.2d 91, 211 N.E.2d 203 (noting the adoption of urban-renewal programs by cities across the nation). These modern urban-renewal and redevelopment efforts fostered the convergence of the public-health police power and eminent domain.

{¶ 57} In this paradigm, the concept of public use was altered. Rather than furthering a public benefit by appropriating property to *create* something needed in a place where it did not exist before, the appropriations power was used to *destroy* a threat to the public's general welfare and well-being: slums and blighted or deteriorated property. As set forth in a seminal case on such actions:

{¶ 58} "The public evils, social and economic, of [unwholesome] conditions [in the slums], are unquestioned and unquestionable. Slum areas are the breeding places of disease which take toll not only from denizens, but, by spread, from the inhabitants of the entire city and state. Juvenile delinquency, crime, and immorality are there born, find protection, and flourish. Enormous economic loss results directly from the necessary expenditure of public funds to maintain health

and hospital services for afflicted slum dwellers and to war against crime and immorality. * * * Time and again * * * the use by the Legislature of the power of taxation and of the police power in dealing with the evils of the slums, has been upheld by the courts. Now, in continuation of a battle, which if not entirely lost, is far from won, the Legislature has resorted to the last of the trinity of sovereign powers by giving to a city agency the power of eminent domain." *New York City Hous. Auth. v. Muller* (1936), 270 N.Y. 333, 339, 1 N.E.2d 153.

{¶ 59} Historic notions equating physical, moral, and social illnesses with slums and blighted areas were reinforced. The term "blight" itself, borrowed from science and connoting an organism that promotes disease, became synonymous with urban decay, and courts were soon invoking the language of disease. See, e.g., *Berman v. Parker* (1954), 348 U.S. 26, 34, 75 S.Ct. 98, 99 L.Ed. 27 ("The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole"); *State ex rel. Ryan v. Gahanna City Council* (1984), 9 Ohio St.3d 126, 131, 9 OBR 377, 459 N.E.2d 208 (Locher, J., concurring) (equating "urban blight" to "malignant cancer"); Pritchett, 21 Yale L. & Policy Rev. at 3 (noting the "disease" rhetoric adopted by renewal advocates); Lawrence M. Friedman, Government and Slum Housing: A Century of Frustration (1968) 169 (noting references to blight as "a disease of urban life" and as a "kind of cancer"). Urban renewal, through the force of eminent domain, became the treatment for saving the body politic from the spread of blight,[11] see Pritchett, 21 Yale L. & Policy Rev. at 4, and there was little doubt that a taking of blighted property for purposes of redevelopment was within the broad and inclusive concept of public use. See *Berman,* 348 U.S. at 33, 75 S.Ct. 98, 99 L.Ed. 27; *Bruestle,* 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778, paragraph one of the syllabus; see, also, *Kelo,* 545 U.S. at ——, 125 S.Ct. at 2665, 162 L.Ed.2d 439. Almost all courts, including this one, have consistently upheld takings that seized slums and blighted or deteriorated private property for redevelopment, even when the property was then transferred to a private entity, and continue to do so. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d at 160, 553 N.E.2d 597; *Bruestle,* 159 Ohio St. at 22–24, 50 O.O. 6, 110 N.E.2d 778. These rulings properly employed an elastic public-use analysis to promote eminent domain as an answer to clear and present public-health concerns, permitting razing and "slum clearance."

{¶ 60} But to some they also signaled an almost unbridled expansion of the notion of public use, which led commentators to suggest that the public-use

---

11. And zoning regulations—the preventive medicine to ward off blight—have been upheld as valid exercises of the police powers over due-process challenges. *Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 386–387, 47 S.Ct. 114, 71 L.Ed. 303.

requirement was dead or dying. See, e.g., The Public Use Limitation on Eminent Domain, 58 Yale L.J. at 600, 605, 613–614; The Private Use of Public Power, 27 Vand.LRev. at 704, fn. 97, and authorities cited therein. Although the death knell has not officially sounded, the modern understanding of public use has permitted somewhat novel findings. See, e.g., *Hawaii Hous. Auth. v. Midkiff* (1984), 467 U.S. 229, 241–244, 104 S.Ct. 2321, 81 L.Ed.2d 186 (finding sufficient public benefit in the abolition of a land oligopoly to warrant taking private property by eminent domain). In some jurisdictions, a belief has taken hold that general economic development is a public use. See, e.g., *Jamestown v. Leevers Supermarkets, Inc.* (N.D.1996), 552 N.W.2d 365, 369, and cases cited therein; *Poletown Neighborhood Council v. Detroit* (1981), 410 Mich. 616, 304 N.W.2d 455, overruled by *Wayne Cty. v. Hathcock* (2004), 471 Mich. 445, 684 N.W.2d 765; *Duluth v. State* (Minn.1986), 390 N.W.2d 757, 763–764; *Prince George's Cty. v. Collington Crossroads, Inc.* (1975), 275 Md. 171, 191, 339 A.2d 278; Thomas W. Merrill, The Economics of Public Use (1986), 72 Cornell L.Rev. 61. *Kelo* confirmed this view for purposes of federal constitutional analysis, id., 545 U.S. at ——, 125 S.Ct. at 2665, 162 L.Ed.2d 439, despite the fact that many legal commentators have expressed alarm at the potential abuse of the eminent-domain power in such circumstances, see *Kelo v. New London* (2004), 268 Conn. 1, 132–133, 843 A.2d 500.

{¶ 61} Inherent in many decisions affirming pronouncements that economic development alone is sufficient to satisfy the public-use clause is an artificial judicial deference to the state's determination that there was sufficient public use. Similarly, in the cases before us, the trial and appellate courts below seem to have been mistaken regarding the scope of review to be employed.

{¶ 62} The trial court properly found an abuse of discretion in Norwood's finding that the area targeted for redevelopment was a slum or a blighted or deteriorated area. But notwithstanding what seems to have been a significant question about whether the taking of the neighborhood could be based on its designation as a "deteriorating area," the trial court appears to have felt constrained by its interpretation of prior cases, stating that judicial review of appropriations is limited and must be deferential to the municipality. In reviewing that decision, the appellate court repeatedly framed its inquiries as whether Norwood abused its discretion by finding that the area was blighted or in danger of deteriorating into a blighted area—inquiries that it answered negatively after applying broad deference and liberal interpretation to Norwood's conclusions.

{¶ 63} The trial and appellate courts correctly stated that, absent a showing of abuse of discretion, deference was due to the city's determination that the area was blighted and deteriorated. (And although deference is certainly due to such findings, it is not absolute deference—as evidenced by the trial judge's correct

conclusion that there was an abuse of discretion in the city's determination in these cases.) But for reasons that we more fully set forth later in our analysis, the courts' conclusion that eliminating a "deteriorating area" satisfied the public-use requirement was an erroneous one. We believe that that error occurred, at least in part, because of a misunderstanding of the scope of review to be given in such inquiries.

{¶ 64} The use of "deteriorating area" as a standard for a taking has never been adopted by this court, but the trial court apparently believed that deference must be given to a city's conclusion that a taking is proper. In affirming the trial court's judgment, the appellate court engaged in a limited independent analysis, noting that "[w]here the exercise of eminent domain is rationally related to a conceivable public purpose, the United States Supreme Court has never held a compensated taking to be prohibited by the public-use clause." 161 Ohio App.3d 316, 2005-Ohio-2448, 830 N.E.2d 381, ¶ 43, citing *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186.

{¶ 65} In addressing the meaning of the public-use clause in Ohio's Constitution, we are not bound to follow the United States Supreme Court's determinations of the scope of the Public Use Clause in the federal Constitution, *Hathcock,* 471 Mich. at 479–480, 684 N.W.2d 765, and we decline to hold that the Takings Clause in Ohio's Constitution has the sweeping breadth that the Supreme Court attributed to the United States Constitution's Takings Clause in *Midkiff,* which presented a novel use of eminent-domain law. Moreover, the court in *Midkiff* noted, "[t]here is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use." 467 U.S. at 240, 104 S.Ct. 2321, 81 L.Ed.2d 186.

{¶ 66} Although there is merit in the notion that deference must be paid to a government's determination that there is sufficient evidence to support a taking in a case in which the taking is for a use that has previously been determined to be a public use, see *Kelo,* 545 U.S. at ——, 125 S.Ct. at 2669, 162 L.Ed.2d 439 (Kennedy, J., concurring) (comparing the deference to rational-basis review in an equal-protection challenge but not foreclosing the possibility that heightened scrutiny might be applied properly in some cases), that deferential review is not satisfied by superficial scrutiny. Id. ("A court applying rational-basis review under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits * * *"). "Even under * * * a deferential standard * * * public use is not established as a matter of law whenever the legislative body acts." *99 Cents Only Stores v. Lancaster Redevelopment Agency* (C.D.Cal.2001), 237 F.Supp.2d 1123, 1129. We agree that the public-use requirement cannot be reduced to mere "hortatory fluff." *Kelo,* 545 U.S. at ——, 125 S.Ct. at 2673, 162

L.Ed.2d 439 (O'Connor, J., dissenting). To the contrary, it remains an essential and critical aspect in the analysis of any proposed taking.

{¶ 67} Despite the relative reluctance of courts to intervene in determinations that a sufficient public benefit supported the taking, the separation-of-powers doctrine "would be unduly restricted" if the state could invoke the police power to virtually immunize all takings from judicial review. See *United States ex rel. Tennessee Valley Auth. v. Welch* (1946), 327 U.S. 546, 556–557, 66 S.Ct. 715, 90 L.Ed. 843 (Reed, J., concurring). See, also, id. at 557, 66 S.Ct. 715, 90 L.Ed. 843 (Frankfurter, J., concurring) (the fact that a court has never struck down a legislative determination of public use as unconstitutional "does not mean that the power to review is wanting"). Though narrow in scope, judicial review is not meaningless in an eminent-domain case. To the contrary, "defining the parameters of the power of eminent domain is a judicial function," *Worthington v. Columbus,* 100 Ohio St.3d 103, 2003-Ohio-5099, 796 N.E.2d 920, ¶ 21, and we remain free to define the proper limits of the doctrine. *Giesy,* 4 Ohio St. at 326. See, also, *Pub. Serv. Co. of Oklahoma v. B. Willis C.P.A., Inc.* (1997), 1997 OK 78, 941 P.2d 995, ¶ 19 ("Under our constitutional provisions and cases interpreting them, the issue of whether a proposed taking is for a 'public use' is a judicial question"); *Merrill v. Manchester* (1985), 127 N.H. 234, 236, 499 A.2d 216 ("Whether a particular use is a public use is a question of law to be resolved by the courts").

{¶ 68} As the Supreme Court of Illinois has observed, "The Constitution and the essential liberties we are sworn to protect control. * * * While we do not question the legislature's discretion in allowing for the exercise of eminent domain power, 'the government does not have unlimited power to redefine property rights.' *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 439, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868, 885 (1982). The power of eminent domain is to be exercised with restraint, not abandon." *Southwestern Illinois Dev. Auth. v. Natl. City Environmental, L.L.C.* (2002), 199 Ill.2d 225, 242, 263 Ill.Dec. 241, 768 N.E.2d 1. Though the Ohio Constitution may bestow on the sovereign a magnificent power to take private property against the will of the individual who owns it, it also confers an "inviolable" right of property on the people. When the state elects to take private property without the owner's consent, simple justice requires that the state proceed with due concern for the venerable rights it is preempting. *Cleveland v. Hurwitz* (P.C.1969), 19 Ohio Misc. 184, 192, 48 O.O.2d 384, 249 N.E.2d 562. See, generally, *Buchanan,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149; *Reckner v. Warner* (1872), 22 Ohio St. 275, 287–288.

{¶ 69} There can be no doubt that our role—though limited—is a critical one that requires vigilance in reviewing state actions for the necessary restraint,

including review to ensure that the state takes no more than that necessary to promote the public use, *Buckingham,* 10 Ohio at 296–297, and that the state proceeds fairly and effectuates takings without bad faith, pretext, discrimination, or improper purpose. See, e.g., *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington* (1987), 399 Mass. 771, 506 N.E.2d 1152; *Earth Mgt., Inc. v. Heard Cty.* (1981), 248 Ga. 442, 283 S.E.2d 455. In the proper exercise of our duty to ensure that property rights are protected, we have held that the state may not take to secure a financial gain by resale of, or taxation on, appropriated land. *Buckingham,* 10 Ohio at 297 ("the exercise of such a power would be utterly destructive of individual right, and break down all the distinctions between *meum et tuum,* and annihilate them forever, at the pleasure of the state"). See, also, *Piedmont Triad Regional Water Auth. v. Sumner Hills, Inc.* (2001), 353 N.C. 343, 346, 543 S.E.2d 844. Thus, our precedent does not demand rote deference to legislative findings in eminent-domain proceedings, but rather, it preserves the courts' traditional role as guardian of constitutional rights and limits. Accordingly, "questions of public *purpose* aside, whether * * * proposed condemnations [are] consistent with the Constitution's 'public use' requirement [is] a constitutional question squarely within the Court's authority." (Emphasis sic.) *Hathcock,* 471 Mich. at 480, 684 N.W.2d 765. See, also, *Cincinnati v. Vester* (1930), 281 U.S. 439, 446, 50 S.Ct. 360, 74 L.Ed. 950 ("It is well established that, in considering the application of the Fourteenth Amendment to cases of expropriation of private property, the question what is a public use is a judicial one. In deciding such a question, the Court has appropriate regard to the diversity of local conditions and considers with great respect legislative declarations and in particular the judgments of state courts as to the uses considered to be public in light of local exigencies. But the question remains a judicial one which this Court must decide in performing its duty of enforcing the provisions of the Federal Constitution"); *Kelo,* 545 U.S. 469, 125 S.Ct. at 2684, 162 L.Ed.2d 439 (Thomas, J., dissenting) (advocating that no deference should be given to "a legislature's judgment concerning the quintessentially legal question of whether the government owns, or the public has the right to use, the taken property").

{¶ 70} The scrutiny by the courts in appropriation cases is limited in scope, but it clearly remains a critical constitutional component. The sovereign's right to take property may be conferred by the legislature on municipalities, which enjoy broad discretion in determining whether a proposed taking serves the public. But it is for the courts to ensure that the legislature's exercise of power is not beyond the scope of its authority, and that the power is not abused by irregular or oppressive use, or use in bad faith. *Pontiac Improvement Co.,* 104 Ohio St. at 458, 135 N.E. 635, citing *Giesy,* 4 Ohio St. at 326. And when the authority is delegated to another, the courts must ensure that the grant of authority is construed strictly and that any doubt over the propriety of the taking is resolved

in favor of the property owner. Id. at 453–454, 135 N.E. 635. In reviewing an appropriation, we thus act with deference to legislative pronouncements, but we are independent of them. See *Hathcock,* 471 Mich. at 480, 684 N.W.2d 765, quoting Justice Ryan's dissenting opinion in *Poletown Neighborhood Council v. Detroit,* 410 Mich. at 669, 304 N.W.2d 455 (" 'In point of fact, this Court has never employed the minimal standard of review in an eminent domain case which is adopted by the majority [in *Poletown* ] * * *. Notwithstanding explicit legislative findings, this Court has always made an independent determination of what constitutes a public use for which the power of eminent domain may be utilized' "). See, also, *Merrill v. Manchester,* 127 N.H. at 237–239, 499 A.2d 216 (holding that in light of declared legislative policy of preserving open lands, plaintiffs' open lands could not be taken for construction of an industrial park, because an industrial park did not provide a direct public benefit); *In re Petition of Seattle* (1981), 96 Wash.2d 616, 627–629, 638 P.2d 549 (without giving deference to legislature's determination, court concluded that primary purpose of planned redevelopment was to promote retail and therefore the contemplated use was "a predominantly private, rather than public, use," and court noted that "[a] beneficial use is not necessarily a public use"); *Owensboro v. McCormick* (Ky.1979), 581 S.W.2d 3, 7–8 (invalidating a statute to the extent that it granted the city or other governmental unit "unconditional right to condemn private property which [was] to be conveyed by the local industrial development authority for private development for industrial or commercial purposes"); *Karesh v. Charleston City Council* (1978), 271 S.C. 339, 343, 247 S.E.2d 342 (holding that a city could not condemn land and lease it to a developer for a parking garage and convention center, because there was no assurance that the new use would provide more than a "negligible advantage to the general public"); *Baycol, Inc. v. Fort Lauderdale Downtown Dev. Auth.* (Fla.1975), 315 So.2d 451, 456–458 (holding that the economic benefit that would come from an appropriation of land for a parking garage and a shopping mall did not satisfy the public-use requirement despite potential economic benefits and holding that any public benefit from construction of the garage was incidental and insufficient to justify the use of eminent domain); *Little Rock v. Raines* (1967), 241 Ark. 1071, 1083–1084, 411 S.W.2d 486 (holding that a proposed taking for an industrial park did not satisfy the public-use clause); *Opinion of the Justices* (1957), 152 Me. 440, 447, 131 A.2d 904 (advisory opinion concluding that a proposed statute that would authorize the city to use eminent domain for the development of an industrial park was unconstitutional).

{¶ 71} A court's independence is critical, particularly when the authority for the taking is delegated to another or the contemplated public use is dependent on a private entity. In such cases, the courts must ensure that the grant of authority is construed strictly and that any doubt over the propriety of the taking

is resolved in favor of the property owner. *Pontiac Improvement Co.*, 104 Ohio St. at 453–454, 135 N.E. 635, citing *Giesy*, 4 Ohio St. at 326.

{¶ 72} Similarly, when the state takes an individual's private property for transfer to another individual or to a private entity rather than for use by the state itself, the judicial review of the taking is paramount. A primordial purpose of the public-use clause is to prevent the legislature from permitting the state to take private property from one individual simply to give it to another. Such a law would be a flagrant abuse of legislative power, see *Calder v. Bull* (1798), 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648, and to give deference to it would be a wholesale abdication of judicial review. See *Kelo*, 545 U.S. at ——, 125 S.Ct. at 2676–2677, 162 L.Ed.2d 439 (O'Connor, J., dissenting).

{¶ 73} As Justice O'Connor correctly discerned in her analysis of the taking in *Kelo*, when the state takes an individual's property and gives it to another based solely on the economic gain afforded by the transfer, the "private benefit and [the] incidental public benefit are, by definition, merged and mutually reinforcing." 545 U.S. at ——, 125 S.Ct. at 2675, 162 L.Ed.2d 439. We agree that due to the mutuality of public and private interests in such cases, a danger exists that the state's decision to take may be influenced by the financial gains that would flow to it or to the private entity because of the taking—a danger that is not apparent when the state or its designee determines whether the appropriation is warranted by communal need and public benefit. See *Kelo*, 268 Conn. at 129–130, 843 A.2d 500 (Zarella, J., concurring in part and dissenting in part) ("Because public agencies must work hand in glove with private developers to achieve plan objectives, the taking agency may employ the power to favor purely private interests. See, e.g., *Southwestern Illinois Development Authority v. National City Environmental, LLC*, 199 Ill.2d 225, 240–241, 263 Ill.Dec. 241, 768 N.E.2d 1 (taking of property for expansion of private parking facility deemed not for public purpose), cert. denied, 537 U.S. 880, 123 S.Ct. 88, 154 L.Ed.2d 135 (2002). The trial court in the present case recognized this problem when it stated in its memorandum of decision that 'powerful business groups or companies [may] exercise their influence to gain their ends with * * * little corresponding benefit to the public.' The majority makes a similar observation. See part IIA of the majority opinion (recognizing 'potential for abuse of the eminent domain power')"). In such circumstances, both common sense and the law command independent judicial review of the taking. "[T]he mere recitation of a benign * * * purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." See *Weinberger v. Wiesenfeld* (1975), 420 U.S. 636, 648, 95 S.Ct. 1225, 43 L.Ed.2d 514.

{¶ 74} Given the individual's fundamental property rights in Ohio, the courts' role in reviewing eminent-domain appropriations, though limited, is important in

all cases. Judicial review is even more imperative in cases in which the taking involves an ensuing transfer of the property to a private entity, where a novel theory of public use is asserted, and in cases in which there is a showing of discrimination, bad faith, impermissible financial gain, or other improper purpose. With our proper role as arbiters of the scope of eminent domain clarified, we turn to the public use at issue in these cases.

{¶ 75} Although we have permitted economic concerns to be considered in addition to other factors, such as slum clearance,[12] when determining whether the public-use requirement is sufficient, we have never found economic benefits alone to be a sufficient public use for a valid taking. We decline to do so now.

{¶ 76} Rather, we find that the analysis by the Supreme Court of Michigan in *Hathcock*, 471 Mich. 445, 684 N.W.2d 765, and those presented by the dissenting judges of the Supreme Court of Connecticut and the dissenting justices of the United States Supreme Court in *Kelo* are better models for interpreting Section 19, Article I of Ohio's Constitution. In *Hathcock*, the court overruled its prior holding in *Poletown Neighborhood Council v. Detroit*, 410 Mich. 616, 304 N.W.2d 455, a case that the court characterized as a "radical and unabashed departure" from eminent-domain jurisprudence. 471 Mich. at 480, 684 N.W.2d 765. See, also, Timothy Sandefur, A Gleeful Obituary for Poletown Neighborhood Council v. Detroit (2005), 28 Harvard J.L. & Pub. Policy 651. *Poletown* had found a generalized economic benefit in the transfer of private property to a private entity sufficient to satisfy the public-use requirement. 410 Mich. at 634, 304 N.W.2d 455. In overturning *Poletown*, the court in *Hathcock* correctly observed:

{¶ 77} "Every business, every productive unit in society, * * * contribute[s] in some way to the commonwealth. To justify the exercise of eminent domain solely on the basis of the fact that the use of that property by a private entity seeking its own profit might contribute to the economy's health is to render impotent our constitutional limitations on the government's power of eminent domain. *Poletown*'s 'economic benefit' rationale would validate practically *any* exercise of the power of eminent domain on behalf of a private entity. After all, if one's

---

12. Any suggestion that our past decisions finding a public use in urban redevelopment support the notion that appropriations for purely economic purposes must also be permitted is incorrect. In past cases, we found that the removal of blight alone conferred a sufficient public benefit to warrant the taking because the discrete act of removing blight served to remove an extant health threat to the public. See *AAAA Ents., Inc.*, 50 Ohio St.3d at 160, 553 N.E.2d 597; *Bruestle*, 159 Ohio St. at 23, 110 N.E.2d 778. Although Justice Stevens suggested that the ensuing redevelopment of the blighted property at issue in *Berman*, 348 U.S. 26, 34, 75 S.Ct. 98, 99 L.Ed. 27, was a critical complement to the razing of the blighted property, see *Kelo*, 545 U.S. ——, 125 S.Ct. at 2665, 162 L.Ed.2d 439, fn. 13, we disagree that the secondary step of remediation is necessarily critical in all cases. A public benefit may inure from redevelopment, but such a benefit might also be conferred by the preservation of open land to secure recreational, ecological, and aesthetic value in a community. See, e.g., *Merrill*, 127 N.H. at 237–238, 499 A.2d 216.

ownership of private property is forever subject to the government's determination that another private party would put one's land to better use, then the ownership of real property is perpetually threatened by the expansion plans of any large discount retailer, 'megastore,' or the like. Indeed, it is for precisely this reason that this Court has approved the transfer of condemned property to private entities only when certain other conditions * * * are present." (Emphasis sic; footnote omitted.) *Hathcock,* 471 Mich. at 482, 684 N.W.2d 765.

{¶ 78} Our understanding of the individual's fundamental rights in property, as guaranteed by the Ohio Constitution and our consistent holdings throughout the past two centuries that a genuine public use must be present before the state invokes its right to take, is better reflected by *Hathcock*'s holdings that economic development by itself is not a sufficient public use to satisfy a taking. Although economic benefit can be considered as a factor among others in determining whether there is a sufficient public use and benefit in a taking, it cannot serve as the sole basis for finding such benefit. Id. See, also, *Sweetwater Valley Civic Assn. v. Natl. City* (1976), 18 Cal.3d 270, 278, 133 Cal.Rptr. 859, 555 P.2d 1099.

{¶ 79} Eminent domain is a power of last resort for the good of the public; it "is not simply a vehicle for cash-strapped municipalities to finance community improvements." *Beach–Courchesne v. Diamond Bar* (2000), 80 Cal.App.4th 388, 407, 95 Cal.Rptr.2d 265. See, also, Hudson Hayes Luce, The Meaning of Blight: A Survey of Statutory and Case Law (2000), 35 Real Prop. Probate & Trust J. 389, 401 (noting that only a small minority of states' eminent-domain statutes permit the consideration of economic use in determining whether property is blighted).

{¶ 80} We hold that an economic or financial benefit alone is insufficient to satisfy the public-use requirement of Section 19, Article I. In light of that holding, any taking based solely on financial gain is void as a matter of law, and the courts owe no deference to a legislative finding that the proposed taking will provide financial benefit to a community.

## C

### *The Void–for–Vagueness Doctrine*

{¶ 81} Due process demands that the state provide meaningful standards in its laws. A law must give fair notice to the citizenry of the conduct proscribed and the penalty to be affixed if that law is breached. See, generally, *Kolender v. Lawson* (1983), 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903; *Colten v. Kentucky* (1972), 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584. Implicitly, the law must also convey an understandable standard capable of enforcement in the courts, *Giaccio v. Pennsylvania* (1966), 382 U.S. 399, 403, 86 S.Ct. 518, 15

L.Ed.2d 447, for judicial review is a necessary constitutional counterpoise to the broad legislative prerogative to promulgate codes of conduct.

{¶ 82} Although the vagueness doctrine is perhaps most familiar in the context of criminal law, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky* (1966), 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469. As the United States Supreme Court has explained:

{¶ 83} "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to police [officers], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (Footnotes omitted.) *Grayned v. Rockford* (1972), 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222.

{¶ 84} When a statute is challenged under the due-process doctrine prohibiting vagueness, the court must determine whether the enactment (1) provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement. *Kolender,* 461 U.S. at 357, 103 S.Ct. 1855, 75 L.Ed.2d 903. The determination of whether a statute is impermissibly imprecise, indefinite, or incomprehensible, see *Buckley v. Wilkins,* 105 Ohio St.3d 350, 2005-Ohio-2166, 826 N.E.2d 811, ¶ 19 and *Coates v. Cincinnati* (1971), 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214, must be made in light of the facts presented in the given case and the nature of the enactment challenged. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362, and fn. 7.

{¶ 85} In undertaking that inquiry into the statute or ordinance at issue, the courts are to apply varying levels of scrutiny. "The difference between the various levels of scrutiny for vagueness has never been definitively spelled out, as in equal protection jurisprudence." *ABN 51st St. Partners v. New York* (S.D.N.Y.1989), 724 F.Supp. 1142, 1147. Though the degree of review is not described with specificity, regulations that are directed to economic matters and impose only civil penalties are subject to a "less strict vagueness test," but if the enactment "threatens to inhibit the exercise of constitutionally protected rights," a more stringent vagueness test is to be applied. *Hoffman Estates,* 455 U.S. at 498–499, 102 S.Ct. 1186, 71 L.Ed.2d 362.

{¶ 86} In either rubric, however, a statute is not void simply because it could be worded more precisely or with additional certainty. *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 358, 588 N.E.2d 116, citing *Roth v. United States* (1957), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. The critical question in all cases is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law; those laws that do not are void for vagueness. *Grayned,* 408 U.S. at 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222; *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110.

{¶ 87} The vagueness doctrine is usually applied in criminal law and First Amendment claims, but neither the rationale underlying the doctrine nor the case law interpreting it suggests that it should not be applied in any case in which the statute challenged substantially affects other fundamental constitutional rights. See *Jordan v. De George* (1951), 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (applying the doctrine to a deportation statute); *Giaccio,* 382 U.S. at 402, 86 S.Ct. 518, 15 L.Ed.2d 447. And, of course, the Due Process Clause of the Fourteenth Amendment demands that fair notice be given to a property owner in an appropriation action. See, e.g., *Walker v. Hutchinson* (1956), 352 U.S. 112, 115–117, 77 S.Ct. 200, 1 L.Ed.2d 178 (notice by publication held inadequate in appropriation case). See, also, *Lambert v. California* (1957), 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 ("Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed").

{¶ 88} Given that eminent domain necessarily entails the state's intrusion onto the individual's right to garner, possess, and preserve property and that sufficient notice is the critical core of the void-for-vagueness doctrine, the doctrine has utility in eminent-domain cases. We hold that when a court reviews an eminent-domain statute or regulation under the void-for-vagueness doctrine, the court shall use the heightened standard of review employed for a statute or regulation that implicates a First Amendment or other fundamental constitutional right. See *Hoffman Estates,* 455 U.S. at 498–499, 102 S.Ct. 1186, 71 L.Ed.2d 362.

{¶ 89} With the controlling constitutional law established, we turn now to its particular applications in the instant cases.

### III. APPLICATION OF THE LAW TO THE FACTS

#### A

*Norwood Code's Use of "Deteriorating Area" as a Standard for a Taking*

{¶ 90} This court has affirmed cases in which a taking of property was upheld upon a showing that the property was a slum, or blighted, or, in effect,

deteriorated. See, e.g., *AAAA Ents.*, 50 Ohio St.3d 157, 553 N.E.2d 597; *Bruestle*, 159 Ohio St. 13, 50 O.O. 6, 110 N.E.2d 778; *St. Stephen's Club v. Youngstown Metro. Hous. Auth.* (1953), 160 Ohio St. 194, 52 O.O. 3, 115 N.E.2d 385. But this is the first time that we have reviewed a judgment that condoned the taking of property upon a finding that the property is in an area that is deteriorating. We refuse to affirm it.

{¶ 91} The takings in the instant cases were based solely on a finding that the neighborhood was a deteriorating area. But what notice does the term "deteriorating area" give to an individual property owner?

{¶ 92} As defined by the Norwood Code, a "deteriorating area" is not the same as a "slum or blighted or deteriorated area," the standard typically employed for a taking. And here, of course, there was no evidence to support a taking under that standard. To the contrary, the buildings in the neighborhood were generally in good condition and the owners were not delinquent in paying property taxes. There is no suggestion that the area was vermin-infested or subject to high crime rates or outbreaks of disease, or otherwise posed an impermissible risk to the larger community.

{¶ 93} The Norwood Code sets forth a fairly comprehensive array of conditions that purport to describe a "deteriorating area," including those found by the trial judge in this case: incompatible land uses, nonconforming uses, lack of adequate parking facilities, faulty street arrangement, obsolete platting, and diversity of ownership. In addition, the trial court identified the following factors as supporting the determination that the neighborhood was deteriorating: increased traffic, dead-end streets that impede public-safety vehicles, numerous curb cuts and driveways, and small front yards. But all of those factors exist in virtually every urban American neighborhood.[13] Because the Norwood Code's definition of a deteriorating area describes almost any city, it is suspect. See *Beach–Courchesne*, 80 Cal.App.4th at 407, 95 Cal.Rptr.2d 265 ("If the showing made in [this] case were sufficient to rise to the level of blight, it is the rare locality in California that is not afflicted with that condition"); *Birmingham v. Tutwiler Drug Co.* (Ala.1985), 475 So.2d 458, 466 (the area alleged to be blighted "was typical of much of downtown Birmingham").

{¶ 94} Similarly, some of the factors upon which the court relied, such as diversity of ownership, could apply to many neighborhoods. And although the term commonly appears in eminent-domain cases and regulations, it is susceptible of many meanings and to manipulation.

---

13. The conditions found by the trial court here are endemic to urban neighborhoods, including some of the most exclusive in America, e.g., Beacon Hill in Boston, Greenwich Village and Tribeca in lower Manhattan, and Nob Hill in San Francisco.

{¶ 95} Here, the term appears in the Norwood Code but is not defined. The trial court held that the term could mean either "several owners of a single property or several owners of different properties" but that the latter definition applied in the instant cases. Other courts seem to have attributed the former meaning to the term. See *Beach–Courchesne,* 80 Cal.App.4th at 405, 95 Cal. Rptr.2d 265 ("The mere fact of multiple ownership does not establish blight. Otherwise, a condominium development would by definition be blighted"). The ambiguity of the term portends impermissible vagueness because it does not afford fair warning to property owners and permits arbitrary or discriminatory enforcement. See *Grayned,* 408 U.S. at 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222.

{¶ 96} Moreover, diversity of ownership is a factor of questionable weight. As seems to have been the case here, diversity of ownership is typically considered to be a negative factor for a neighborhood because it purportedly impedes development. Yet Rookwood was able to secure virtually every property owner's assent to sale without any apparent difficulty. Thus, though diversity of ownership may be a factor to consider in determining whether an area is deteriorated, it is not a compelling one.

{¶ 97} In the cases before us, we cannot say that the appellants had fair notice of what conditions constitute a deteriorating area, even in light of the evidence adduced against them at trial. The evidence is a morass of conflicting opinions on the condition of the neighborhood. Though the Norwood Code's definition of "deteriorating area" provides a litany of conditions, it offers so little guidance in application that it is almost barren of any practical meaning.

{¶ 98} In essence, "deteriorating area" is a standardless standard. Rather than affording fair notice to the property owner, the Norwood Code merely recites a host of subjective factors that invite ad hoc and selective enforcement— a danger made more real by the malleable nature of the public-benefit requirement. We must be vigilant in ensuring that so great a power as eminent domain, which historically has been used in areas where the most marginalized groups live, is not abused.

{¶ 99} As important, the standard for "deteriorating area" defined in the Norwood Code is satisfied not just upon a finding that a neighborhood *is* deteriorating or *will* deteriorate, but is also satisfied by a finding that it "*is in danger of* deteriorating into a blighted area." The statutory definition, therefore, incorporates not only the existing condition of a neighborhood, but also extends to what that neighborhood might become. But what it *might* become may be no more likely than what *might not* become. Such a speculative standard is inappropriate in the context of eminent domain, even under the modern, broad interpretation of "public use."

{¶ 100} A municipality has no authority to appropriate private property for only a contemplated or speculative use in the future. See *State ex rel. Sun Oil Co. v. Euclid* (1955), 164 Ohio St. 265, 271–272, 58 O.O. 25, 130 N.E.2d 336, citing *Cincinnati v. Vester,* 281 U.S. at 448, 50 S.Ct. 360, 74 L.Ed. 950. As we said in *O'Neil* :

{¶ 101} "Public use cannot be determined as of the time of completion of a proposed development, but must be defined in terms of present commitments which in the ordinary course of affairs will be fulfilled.

{¶ 102} " ' * * * If the public use is contingent and prospective and the private use or benefit is actual and present, the public use would be incidental to the private use, and in such a case the power of eminent domain clearly could not lawfully be exercised.' *Kessler v. City of Indianapolis* (1927), 199 Ind. 420, 430, 157 N.E. 547, 550, 53 A.L.R. 1." *O'Neil,* 3 Ohio St.2d at 58, 32 O.O.2d 42, 209 N.E.2d 393.

{¶ 103} A fundamental determination that must be made before permitting the appropriation of a slum or a blighted or deteriorated property for redevelopment is that the property, because of its existing state of disrepair or dangerousness, poses a threat to the public's health, safety, or general welfare. Although we adhere to a broad construction of "public use," we hold that government does not have the authority to appropriate private property based on mere belief, supposition, or speculation that the property may pose such a threat in the future. *O'Neil,* supra; *Sun Oil Co.,* supra. See, also, *99 Cents Only Stores,* 237 F.Supp.2d at 1130–1131, and cases cited therein; *Merrill v. Manchester,* 127 N.H. at 238–239, 499 A.2d 216; *Baycol, Inc. v. Fort Lauderdale Downtown Dev. Auth.,* 315 So.2d at 457–458. See, also, *Grand Rapids Bd. of Edn. v. Baczewski* (1954), 340 Mich. 265, 271–272, 65 N.W.2d 810 (invalidating a taking that was based on speculation that a school might be built on the property 30 years in the future). To hold otherwise would permit the derogation of a cherished and venerable individual right based on nothing more than "a plank of hypothesis flung across an abyss of uncertainty." Edith Wharton, The Descent of Man, 35 Scribner's Magazine (Mar.1904) 313, 321, reprinted in 1 The Selected Short Stories of Edith Wharton (1991) 49, 62. To permit a taking of private property based solely on a finding that the property is deteriorating or in danger of deteriorating would grant an impermissible, unfettered power to the government to appropriate.

{¶ 104} We therefore hold that the use of "deteriorating area" as a standard for determining whether private property is subject to appropriation is void for vagueness and offends due-process rights because it fails to afford a property owner fair notice and invites subjective interpretation. Further, we hold that the term "deteriorating area" cannot be used as a standard for a taking, because it inherently incorporates speculation as to the future condition of the property into

the decision on whether a taking is proper rather than focusing that inquiry on the property's condition at the time of the proposed taking.

{¶ 105} Because Norwood may not justify its taking of appellants' property on either the basis that the neighborhood was deteriorating or on the basis that the redeveloped area would bring economic value to the city, there is no showing that the taking was for public use. Our conclusion is not altered by the amount of compensation offered to the property owners in this case, even if it was in excess of the fair market value of their property. Though the questions of just compensation and public use are both critical in an eminent-domain analysis, they must be assessed and satisfied independently. Here, there is not an adequate showing that the takings were for a public use. Accordingly, we reverse the judgment of the court of appeals that affirmed the trial court's holding that the appropriation of the appellants' property was permitted.

## B

### *Constitutionality of R.C. 163.19*

{¶ 106} We turn now to the constitutionality of R.C. 163.19, one provision of many in R.C. Chapter 163, which governs appropriation actions in Ohio.

{¶ 107} R.C. 163.19 provides that if the owner fails to persuade the trial court that the taking is not necessary, "any party may prosecute appeals as in other civil actions from the judgment of the court. The trial court upon proper terms may suspend the execution of any order; *but in all cases where the agency pays or deposits the amount of the award assessed and gives adequate security for any further compensation and costs, as required by the court, the right to take and use the property appropriated shall not be affected by such review by the appellate courts.*" (Emphasis added.) We must now determine the effect of the emphasized statutory language on appellate review when the agency has paid the award and has given the required security.[14]

{¶ 108} As we explained in *Cincinnati Gas & Elec. Co. v. Pope* (1978), 54 Ohio St.2d 12, 18–19, 8 O.O.3d 7, 374 N.E.2d 406, R.C. 163.19 expresses the legislature's balancing of vital interests:

{¶ 109} "The General Assembly has apparently decided that the health, safety and welfare of the general public will be promoted by the speedy construction of necessary public projects. R.C. 163.19 thus appears to be a compromise measure which preserves the property owner's traditional right to appellate review of the trial court's findings on the preliminary issues, but which also grants to the

---

14. There is no dispute that Norwood is an "agency" as that term is defined by R.C. 163.19, see R.C. 163.01(A), and that Norwood paid the compensation awards assessed by the jury.

appropriating agency the right to take and use the appropriated property while such appellate review is pending.

{¶ 110} " * * * In the majority of appeals in appropriation cases there would be no reason to delay construction of a public project when only the jury award of compensation is contested. In those rare instances where the property owner successfully appeals the preliminary issues of the right to take and the necessity for the take, the title to the property previously conferred upon the appropriating agency, under R.C. 163.15, is thereupon subject to defeasance. Finally, we recognize that because of the balance struck within R.C. 163.19, there is the possibility that the contested property might be damaged by the appropriating agency after it acquires title thereto under R.C. 163.15, only to be later restored, in this damaged condition, to the property owner who successfully appeals the preliminary issues. It is therefore imperative that the property owner who prosecutes an appeal on other than the jury award of compensation adequately inform the appellate court of his dilemma, so that the appellate court might implement the special provision of R.C. 163.22 which mandates that '[a]ll proceedings brought under sections 163.01 to 163.22, inclusive, * * * shall be advanced as a matter of immediate public interest and concern and shall be heard by the court at the earliest practicable moment.' "

{¶ 111} The appellants concede that per R.C. 163.19, "an agency in possession of appropriated property is shielded from a [former] property's owner's attempts to prevent the demolition of his [former] property during the appellate process." In this way, the taking operates so that "the true rule of justice for the public would be, to pay the compensation with one hand whilst they apply the axe with the other." *Parks v. Boston* (1834), 32 Mass. (15 Pick.) 198, 208, 1834 WL 2628.

{¶ 112} The appellants contend, however, that because Norwood transferred title to Rookwood after the taking, R.C. 163.19 no longer applies, because Rookwood is not an "agency" as required by the statute. The trial court rejected this argument, holding that pursuant to the express language of R.C. 163.19, "once Norwood deposited the full amount, Norwood was free to take and use the property pending appeal; this includes transferring the property pursuant to its urban renewal plan." We agree in part.

{¶ 113} It is clear that the General Assembly enacted R.C. Chapter 163 with full knowledge of the issues implicated by appropriation and eminent-domain proceedings, ultimately favoring a scheme in which such matters receive expedited attention in the courts, as provided by R.C. 163.22, but in which injunctive relief pending appellate consideration is not permitted. Although we agree with the court of appeals' apparent conclusion that the term "use" in R.C. 163.19 was intended to encompass the right to transfer appropriated property to another who may raze and redevelop it, we do not agree that the General Assembly may

preclude appellate courts from issuing an injunction preventing that use pending further appellate review.

{¶ 114} The separation-of-powers doctrine represents the constitutional diffusion of power within our tripartite government. The doctrine was a deliberate design to secure liberty by simultaneously fostering autonomy and comity, as well as interdependence and independence, among the three branches. See, e.g., *Fairview v. Giffee* (1905), 73 Ohio St. 183, 187, 76 N.E. 865; *Zanesville v. Zanesville Tel. & Tel. Co.* (1900), 63 Ohio St. 442, 451, 59 N.E. 109; *Youngstown Sheet & Tube Co. v. Sawyer* (1952), 343 U.S. 579 635, 72 S.Ct. 863, 96 L.Ed. 1153 (Jackson, J., concurring). The doctrine "is 'implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government.'" *State ex rel. Bray v. Russell,* 89 Ohio St.3d 132, 134, 729 N.E.2d 359, quoting *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 159, 28 OBR 250, 503 N.E.2d 136. We previously explained as follows:

{¶ 115} " '[T]he people possessing all governmental power, adopted constitutions, completely distributing it to appropriate departments.' *Hale v. State* (1896), 55 Ohio St. 210, 214, 45 N.E. 199, 200. They vested the legislative power of the state in the General Assembly (Section 1, Article II, Ohio Constitution), the executive power in the Governor (Section 5, Article III, Ohio Constitution), and the judicial power in the courts (Section 1, Article IV, Ohio Constitution). They also specified that ' "[t]he general assembly shall [not] * * * exercise any judicial power, not herein expressly conferred." ' Section 32, Article II, Ohio Constitution.

{¶ 116} "The power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers. See, *e.g., Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 508 ('[i]nterpretation of the state and federal Constitutions is a role exclusive to the judicial branch')." *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 462, 715 N.E.2d 1062.

{¶ 117} There can be no debate that pursuant to Section 1, Article IV of the Ohio Constitution, the judicial power resides exclusively in the judicial branch, *Bray,* 89 Ohio St.3d at 136, 729 N.E.2d 359, and *Ex parte Logan Branch of State Bank* (1853), 1 Ohio St. 432, and that our authority within that realm shall not be violated. Indeed, jurists have long understood that they must be wary of any usurpation of the powers conferred on the judiciary by constitutional mandate and any intrusion upon the courts' inherent powers, i.e., those powers that "are necessary to the orderly and efficient exercise of jurisdiction" and without which "no other [power] could be exercised." *Hale,* 55 Ohio St. 210, 213, 45 N.E. 199.

Vigilance is necessary to ensure the security and harmony of the government, *Weaver v. Lapsley* (1869), 43 Ala. 224, 1869 WL 503, *5, and to avoid the evils that would flow from legislative encroachments on our independence. *Lawson v. Jeffries* (1873), 47 Miss. 686, 1873 WL 4108, *8. See, also, *Smothers v. Lewis* (Ky., 1984), 672 S.W.2d 62, 64; *Modern Homes Constr. Co. v. Burke* (1964), 219 Ga. 710, 135 S.E.2d 383, and cases cited therein. We must thus "jealously guard the judicial power against encroachment from the other two branches of government and * * * conscientiously perform our constitutional duties and continue our most precious legacy." *Sheward*, 86 Ohio St.3d at 467, 715 N.E.2d 1062.

{¶ 118} It is well settled in an array of jurisdictions that the courts' inherent authority includes the power to issue or to deny stays, *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 464, 668 N.E.2d 457, citing *Landis v. N. Am. Co.* (1936), 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153, and *State v. Smith* (1989), 42 Ohio St.3d 60, 61, 537 N.E.2d 198; *Ethicon, Inc. v. Quigg* (Fed.Cir.1988), 849 F.2d 1422, 1426–1427; *Michael v. Ghee* (N.D.Ohio 2004), 325 F.Supp.2d 829, 831, and to grant or deny injunctions, *Welker v. Cicerone* (C.D.Cal.2001), 174 F.Supp.2d 1055, 1062 ("The court has inherent authority to grant preliminary injunctive relief in the exercise of its equitable powers"), citing *In re Estate of Marcos, Human Rights Litigation* (C.A.9, 1994), 25 F.3d 1467, 1476; accord *Brown v. Neeb* (C.A.6, 1981), 644 F.2d 551, 559–560 (affirming district court's use of injunctive relief as part of its inherent authority to effectuate consent decree previously entered by the parties), particularly during appellate review, *Madjorous v. State* (1925), 113 Ohio St. 427, 433, 149 N.E. 393 ("the courts do not possess the inherent power to suspend a sentence in a criminal prosecution, *except to stay the sentence for a time after conviction, for the purpose of giving an opportunity for a motion for a new trial or in arrest of judgment or during the pendency of a proceeding in error* " [emphasis added] ); accord *Pontiac Improvement Co.*, 104 Ohio St. at 453–454, 135 N.E. 635. The Supreme Court of Kentucky more fully explained as follows in striking as unconstitutional the portion of a state statute that forbade the courts to enjoin an order revoking a license to serve alcoholic beverages pending appeal:

{¶ 119} "[W]e now * * * once and for all make clear that a court, once having obtained jurisdiction of a cause of action, has, as an incidental to its constitutional grant of power, inherent power to do all things reasonably necessary to the administration of justice in the case before it. *In the exercise of this power, a court, when necessary in order to protect or preserve the subject matter of the litigation,* to protect its jurisdiction and to make its judgment effective, *may grant or issue a temporary injunction in aid of or ancillary to the principal action.*

{¶ 120} "The control over this inherent judicial power, in this particular instance the injunction, is exclusively within the constitutional realm of the courts. *As such, it is not within the purview of the legislature to grant or deny the power nor is it within the purview of the legislature to shape or fashion circumstances under which this inherently judicial power may be or may not be granted or denied.* * * *

{¶ 121} " * * * The statutorily granted right to appeal under [state statutes] was [appellant's] basis for this action * * *.  However, the fact that the legislature statutorily provided for this appeal does not give it the right to encroach upon the constitutionally granted powers of the judiciary.  Once the administrative action has ended and the right to appeal arises the legislature is void of any right to control a subsequent appellate judicial proceeding.  The judicial rules have come into play and have preempted the field.

{¶ 122} " * * *

{¶ 123} "The language of [the provision of the statute forbidding injunctions] directly locks horns with the constitutionally inherent injunction power of the courts when it says, 'No court may enjoin the operation of an order of revocation or suspension pending an appeal.'  Such language is a classic example of the very type of legislative encroachment onto the power of the judicial branch of our government which is constitutionally impermissible."  (Emphasis added.) *Smothers,* 672 S.W.2d at 64–65.

{¶ 124} In *Hochhausler,* 76 Ohio St.3d 455, 668 N.E.2d 457, we reached a similar result after examining the no-stay provision that prohibited the courts from staying a suspension of a driver's license imposed for operating a motor vehicle under the influence of alcohol.  After reiterating that the courts " 'possess all powers necessary to secure and safeguard the free and untrammeled exercise of their judicial functions and cannot be directed, controlled or impeded therein by other branches of the government,' " id. at 464, 668 N.E.2d 457, quoting *State ex rel. Johnston v. Taulbee* (1981), 66 Ohio St.2d 417, 20 O.O.3d 361, 423 N.E.2d 80, paragraph two of the syllabus, we held that the no-stay provision deprived courts of their proper authority to stay administrative suspensions by improperly interfering with the exercise of judicial functions.  We thus found that the statute violated the doctrine of separation of powers and was unconstitutional.

{¶ 125} We find the rationale of *Hochhausler* compelling here, particularly given the rights and risks implicated by eminent-domain actions.  R.C. 163.19's blanket proscription on stays or injunctions against the taking and using of appropriated property pending appellate review is an unconstitutional encroachment on the judiciary's constitutional and inherent authority in violation of the separation-of-powers doctrine.[15]

---

15. We recognize that some courts have held that a legislative body may prohibit a court from issuing injunctions without infringing on the separation of powers, but each of those cases presented

{¶ 126} As we recently held in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 94–95, per R.C. 1.50, severance of an unconstitutional portion of a statute is appropriate when the *Geiger* test is satisfied. See *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28 (requiring that three questions be answered in determining whether severance is appropriate: "(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?"). We hold that *Geiger* is satisfied in this case and therefore severance is appropriate.

{¶ 127} Severing the unconstitutional portion of R.C. 163.19 leaves only the first sentence, which reads as follows: "Subject to sections 163.07 and 163.09 of the Revised Code, any party may prosecute appeals as in other civil actions from the judgment of the court." Although it appears that part of the legislature's intent in the statute was to prevent the issuance of stays or injunctions pending appellate review, *Pope*, 54 Ohio St.2d at 18–19, 8 O.O.3d 7, 374 N.E.2d 406, even if doing so could lead to the destruction of the property that is the subject of the appeal, *State ex rel. Horwitz v. Cuyahoga Cty. Court of Common Pleas, Probate Div.* (1992), 65 Ohio St.3d 323, 328, 603 N.E.2d 1005, the severance of the constitutionally infirm portion of the statute (i.e., that portion that bars injunctions or stays pending appellate review) leaves vital language. The first sentence of the statute provides a right of appeal to litigants in eminent-domain proceedings "as in other civil actions from the judgment of the court," but "[s]ubject to sections 163.07 and 163.09 of the Revised Code." Because there is no inherent right of appeal from a judgment and the General Assembly has the authority to limit the power of appellate courts to review judgments of the trial courts, see *Pope*, 54 Ohio St.2d at 15, 17–18, 8 O.O.3d 7, 374 N.E.2d 406, the first sentence of

---

unusual circumstances, such as annexation proceedings, see, e.g., *Westminster v. Adams Cty. Dist. Court* (1968), 167 Colo. 263, 268, 447 P.2d 537; war or other national emergency, see, e.g., *Taylor v. Brown* (Emergency Ct.App.1943), 137 F.2d 654; see, also, *Lauf v. E.G. Shinner & Co., Inc.* (1938), 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (affirming constitutionality of Norris–LaGuardia Act, Section 101 et seq., U.S.Code, which forbids, inter alia, the issuance of temporary or permanent injunctions in cases arising from labor disputes, absent certain requisite findings); *Baton Rouge Coca–Cola Bottling Co., Ltd. v. Gen. Truck Drivers Warehousemen & Helpers, Local Union No. 5* (La.1981), 403 So.2d 632, 636; *Levering & Garrigues Co. v. Morrin* (C.A.2, 1934), 71 F.2d 284, 286–287; *In re Cleveland & Sandusky Brewing Co.* (N.D.Ohio 1935), 11 F.Supp. 198, 206. When exigent or unique circumstances are not present and the bar of injunctive relief leaves a party without sufficient remedy, the rationale for the bar fails. See, e.g., *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 41–42, 25 N.E.2d 482; *Lougee v. New Mexico Bur. of Revenue Commr.* (1938), 42 N.M. 115, 76 P.2d 6, 15; *Eddy v. Lee Twp.* (1888), 73 Mich. 123, 129, 40 N.W. 792; *Guy v. Hermance* (1855), 5 Cal. 73, 63 Am. Dec. 85, 1855 WL 655.

R.C. 163.19 is necessary to effectuate part of the legislative intent in enacting the statute. That section can stand on its own without the insertion or inclusion of words not present in the statute. Further, it serves an important role independent of the severed section. The *Geiger* test is thus satisfied. The unconstitutional portion of R.C. 163.19 can be severed from the rest of the statute, and, accordingly, the remainder of the statute remains in effect.

{¶ 128} In reaching the conclusion that part of R.C. 163.19 is unconstitutional, we recognize that our decisions in *Pope, State ex rel. Suburban Constr. Co. v. Skok* (1999), 85 Ohio St.3d 645, 648, 710 N.E.2d 710, and *Horwitz,* 65 Ohio St.3d 323, 328, 603 N.E.2d 1005, may suggest a different result. Closer scrutiny of those cases, however, shows that in those cases we did not address the issue whether R.C. 163.19 violates the separation of powers, which controls the result here.

{¶ 129} In *Pope,* utility companies sought to acquire easements across properties for a high-voltage transmission line. The property owners in that case argued that R.C. 163.19 rendered meaningless appellate review of the trial court's decision and thereby deprived the appellants of due process. We held that R.C. 163.19 did not offend due process, but we did not address whether it infringed on judicial authority. *Pope* is thus distinguishable from the instant case.

{¶ 130} Similarly, in *Skok,* we did not consider whether R.C. 163.19 violated the separation-of-powers doctrine. *Skok* was an appeal from a denial of a writ of prohibition sought to prevent a judge from proceeding further in an appropriation case. We held that the "mere fact that [the property owner] may lose its right to enter and take possession of the property pending appeal, see R.C. 163.15 and 163.19, [did] not render appeal an inadequate remedy," because if the property owner were to prevail on appeal, it would be entitled to repossess the property, and the money that had been deposited by appellee as security would make the property owner whole.

{¶ 131} In *Horwitz,* 65 Ohio St.3d 323, 603 N.E.2d 1005, the appellant was a leaseholder of property that was subject to appropriation. The trial court ruled that Horwitz lacked standing to challenge the appropriation because the lessor had not contested it. Horwitz then brought an action for mandamus to compel the court to grant her a hearing to challenge the right to and necessity of the appropriation.

{¶ 132} We found merit in Horwitz's averment that she lacked an adequate remedy pending appeal because she could not recover even the financial protections afforded by the statute because her right to a hearing on compensation had been denied. Id. at 328, 603 N.E.2d 1005. In light of the inadequacy of any appellate remedy in that unique context, a divided court granted her mandamus relief. As in *Pope* and *Skok,* however, we did not address any issue related to the

separation-of-powers doctrine. Thus, despite our past discussions of the statute, we have never suggested that it represents a valid exercise of legislative prerogative in light of the separation-of-powers doctrine.

{¶ 133} But for our orders in this case, the appellants' property would likely have already been razed. Although we reiterate that it is imperative that appellate courts review these cases as expeditiously as possible, *Pope*, 54 Ohio St.2d at 19, 8 O.O.3d 7, 374 N.E.2d 406, we doubt the courts' ability, absent the authority to issue a stay, to move more quickly than a bulldozer.

{¶ 134} In light of our holding, we reverse the judgments of the court of appeals denying injunctive relief.

## IV. CONCLUSION

{¶ 135} We are cognizant of the particular importance of this decision and its pronouncements of constitutional law in informing the actions that are to be taken by the General Assembly. We agree with the following statement made by Justice Zarella in his opinion concurring in part with and dissenting in part from the Supreme Court of Connecticut's decision in *Kelo*:

{¶ 136} "Growing fears regarding the potential abuse of the eminent domain power cannot be dismissed as idle speculation on the part of commentators. As municipalities increasingly struggle to provide public services with limited financial resources, governmental authorities are encouraging more intensive economic development to generate additional tax revenue, to create new jobs and to jump start local economies. Accordingly, there is a gathering storm of public debate as to whether the use of eminent domain to acquire property for private economic development in nonblighted areas is justified. * * * [S]uch debate is essential to clarify the role of the legislature in making determinations of public use and the corresponding role of the courts in safeguarding the rights of private property owners who fear that the takings power will be used solely to benefit private interests. The complementary roles of the legislature and the judiciary as interpreters and guardians of the takings power thus require further examination." 268 Conn. at 133, 843 A.2d 500 (Zarella, J., concurring in part and dissenting in part).[16]

---

16. Recognizing that the General Assembly is currently reviewing legislation in this area of law, we have limited our decision to those points of law that we feel must be decided at this juncture. We note, however, that given our reaffirmation that the Ohio Constitution confers on the individual fundamental rights to property that may be violated only when a greater public need requires it, there are significant questions about the validity of the presumption in favor of the state that is set forth in R.C. 163.09(B), which provides that a resolution or ordinance of an agency declaring the necessity of an appropriation shall be prima facie evidence of necessity in the absence of a showing by the property owner of an abuse of discretion. See *Grace v. Koch* (1998), 81 Ohio St.3d 577, 692 N.E.2d 1009, syllabus (holding that elements of adverse possession must be proved by clear and

{¶ 137} In addressing these important matters, we have benefited from the wisdom of other courts, which, by the masterly design of our government, are at the forefront of these critical constitutional questions. Although the judiciary and legislature define the limits of state powers, such as eminent domain, the ultimate guardians of the people's rights, as evidenced by the appellants in these cases, are the people themselves.

Judgments reversed.

MOYER, C.J., BROGAN, PFEIFER, LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

JAMES A. BROGAN, J., of the Second Appellate District, sitting for RESNICK, J.

---

Wood & Lamping, L.L.P, and Robert P. Malloy; and Institute for Justice, Dana Berliner, Scott G. Bullock, William H. Mellor, Robert W. Gall, and David Roland, for appellants.

Manley Burke, L.P.A., Timothy M. Burke, Gary E. Powell, and Daniel J. McCarthy; and Rick G. Gibson, City of Norwood Law Director, and Theodore E. Kiser, Assistant Law Director, for appellee city of Norwood.

Dinsmore & Shohl, L.L.P., Mark A. Vander Laan, Bryan E. Pacheco, Lawrence R. Elleman, and Richard B. Tranter, for appellee Rookwood Partners, Ltd.

Baker & Hostetler, L.L.P., John H. Burtch, David C. Levine, and Marcella L. Lape, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amicus curiae Ohio Association of Realtors.

Michael R. Gareau & Associates, L.P.A., and David M. Gareau, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae Pacific Legal Foundation and the Claremont Institute.

Jones Day, Mark Herrmann, and Mary Beth Young; and Derek L. Gaubatz, Anthony R. Picarello Jr., and Jared N. Leland, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amicus curiae Becket Fund for Religious Liberty.

Barbara J. Morley and Donald Gallick, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amicus curiae the Reason Foundation.

---

convincing evidence); *Addington v. Texas* (1979), 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (noting that the "clear and convincing evidence" standard of proof is often used in cases in which the "interests at stake * * * are deemed to be more substantial than mere loss of money" and "to protect particularly important individual interests in various civil cases").

Gibson Dunn & Crutcher, L.L.P., Jeffrey A. Wadsworth, and Rachel Zwolinski, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amicus curiae Individual Ohio Home and Business Owners.

Hughes & Luce, L.L.P., and Matthew R. Miller, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amicus curiae Property & Environment Research Center.

Jones Day, Douglas M. Mansfield, and Chad A. Readler, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae Ohio Farm Bureau Federation and Hamilton County Farm Bureau.

Browning & Meyer Co., L.P.A., and William J. Browning;  and O'Melveny & Myers, L.L.P., Brian P. Brooks, and Garrett W. Wotkyns, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae Ohio Conference of the National Association for the Advancement of Colored People and National Institute for Urban Entrepreneurship.

Porter Wright Morris & Arthur, L.L.P., David C. Tryon, Jeffrey J. Weber, and Patrick T. Lewis, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae National Federation of Independent Business Legal Foundation and American Association of Small Property Owners.

William G. Batchelder;  and Kirkland & Ellis, L.L.P., Douglas G. Smith, Larry J. Obhof, and Andrew P. Bautista, urging reversal in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae Ashbrook Center for Public Affairs and William G. Batchelder.

Ely M.T. Ryder, urging affirmance in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae Donna Laake, William Pierani, and Paul Triance.

Coolidge, Wall, Womsley & Lombard Co., L.P.A., and John C. Chambers, urging affirmance in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae First Suburbs Consortium of Northeast Ohio, Central Ohio First Suburbs Consortium, First Suburbs Consortium of Southwest Ohio, and First Tier Suburbs Consortium.

Lindner & Weaver, L.L.P., and Daniel F. Lindner, urging affirmance in case Nos. 2005–1210 and 2005–1211 on behalf of amici curiae American Planning Association and Ohio Planning Conference.