OPINION
{¶ 1} Defendant-appellant William H. Stewart appeals from a summary judgment and order of foreclosure rendered in favor of plaintiff-appellee U.S. Bank, NA. Stewart contends that the trial court erred by not granting summary judgment in his favor because the undisputed facts allegedly demonstrated that Stewart substantially *Page 2 
complied with, and that U.S. Bank materially breached, the parties' mortgage agreement. Stewart also contends that the trial court erred in granting U.S. Bank's summary judgment motion because the undisputed facts indicated that the bank was not damaged.
 {¶ 2} We conclude that the trial court properly rendered summary judgment in favor of U.S. Bank, because the undisputed facts demonstrate that Stewart failed to comply with the terms of the note and security instrument. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In September 2001, Stewart borrowed $74,298 from National City Mortgage ("NCM") in order to purchase a home located at 313 Shroyer Road, Dayton, Ohio. Stewart signed a promissory note, indicating that he would repay this sum, plus interest at a rate of 6.1% per year. The promissory note was secured by a Federal Housing Administration (FHA) mortgage and was subject to regulations of the U.S. Department of Housing and Urban Development (HUD).
 {¶ 4} Section 3 of the note stated that:
 {¶ 5} "Borrower's promise to pay is secured by a mortgage, deed of trust or similar security interest that is dated the same date as this Note and called the `Security Instrument.' The Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note."
 {¶ 6} Under the note, Stewart was required to pay principal and interest to the lender on the first day of each month, beginning November 1, 2001. The note provided *Page 3 
in Section 4(C) that:
 {¶ 7} "Each monthly payment of principal and interest will be in the amount of U.S. $450.25. This amount will be part of a larger monthlypayment required by the Security Interest, that shall be applied toprincipal, interest and other items in the order described in theSecurity Instrument." (Emphasis added).
 {¶ 8} The note allowed the lender to collect late charges and stated with respect to default that:
 {¶ 9} "If Borrower defaults by failing to pay in full any monthly payment, then Lender may, except as limited by regulations of the Secretary in the case of payment defaults, require immediate payment in full of the principal balance remaining due and accrued interest. Lender may choose not to exercise this option without waiving its rights in the event of any subsequent default. In many circumstances regulations issued by the Secretary will limit Lender's rights to require immediate payment in full in the case of payment defaults. This Note does not authorize acceleration when not permitted by HUD regulations. As used in this Note, `Secretary' means the Secretary of Housing and Urban Development or his or her designee." Note, Section 6(B).
 {¶ 10} Stewart also signed an Open-end Mortgage or Security Instrument, conveying the Shroyer Road property to NCM as security for repayment of the debt and for performance of Stewart's obligations under the Note and the Security Instrument. The Security Instrument contained various Uniform Covenants agreed to by Stewart and NCM. As pertinent to this case, Stewart agreed to the following:
 {¶ 11} "1. Payment of Principal, Interest and Late Charge. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late *Page 4 
charges due under the Note.
 {¶ 12} "2. Monthly Payment of Taxes, Insurance and Other Charges.Borrower shall include in each monthly payment, together with theprincipal and interest as set forth in the Note and any late charges, asum for (a) taxes and special assessments levied or to be levied againstthe Property, (b) leasehold payments or ground rents on the Property,and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a Mortgage insurance premium to the Secretary of Housing and Urban Development (`Secretary'), or in any year in which such premiums would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these terms are called `Escrow Items' and the sums paid to Lender are called `Escrow Funds.'" (Emphasis added).
 {¶ 13} Paragraph 4 of the Uniform Covenants required Stewart to obtain fire, flood and other hazard insurance on the property with an insurer approved by NCM. In addition, the insurance policy and any renewals were required to include loss payable clauses in favor of the lender. The parties also covenanted and agreed that "If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the *Page 5 
shortage as permitted by RESPA."[1] Uniform Covenants, Section
 {¶ 14} The parties agreed to a specific method of allocating payments, by stating that:
 {¶ 15} "Application of Payments. All payments under paragraphs 1 and 2 shall be applied by Lender as follows:
 {¶ 16} "First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;
 {¶ 17} "Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;
 {¶ 18} "Third, to interest due under the Note; and
 {¶ 19} "Fourth, to amortization of the principal of the Note; and
 {¶ 20} "Fifth, to late charges due under the Note." Id. at Section 3 (Emphasis in original).
 {¶ 21} At the closing, Stewart was furnished with a payment breakdown indicating that his monthly payments would be $613.46, for the following items: (1) principal and interest — $450.25; (2) 1/12 of the total yearly hazard insurance — $37.75; (3) one-half the yearly property tax — $95.13; and (4) 1/12 of the yearly escrow for the FHA mortgage insurance premium (MIP) — $30.33. Stewart agreed to pay these amounts.
 {¶ 22} The hazard insurance premium was paid one year in advance at the time of closing to Spectrum Insurance Agency, and the policy was to be in effect from *Page 6 
September 25, 2001, through September 24, 2002. The amounts subsequently paid into escrow for hazard insurance would then be used to purchase the insurance policy for September 2002, through September 2003. Reserves were also collected for the hazard insurance and county taxes, meaning that after payment of the insurance and taxes, a small amount would remain in the escrow account.
 {¶ 23} After the closing, NCM assigned the note and mortgage to Leader Mortgage Company (Leader). Leader merged with U.S. Bank in 2004, and U.S. Bank then acquired the note and mortgage.
 {¶ 24} For some time, Stewart paid as agreed on the loan. However, Leader did not receive a bill for Stewart's homeowner's insurance for the year beginning in September 2002, and numerous attempts to obtain a bill met with no response. Consequently, Leader obtained "force placed" insurance on the home, at a cost of $1,552 for the period between September 2002, and September 2003. Stewart testified that he had called his agent in September 2002, because he knew his insurance term was about to be up, and told the agent to send a notice to Leader. However, the agent did not do so. When Stewart learned that Leader had obtained force placed insurance, he obtained a policy from a different insurance agent in January 2003. Stewart paid for the insurance himself rather than asking the agent to invoice Leader. The policy that Stewart purchased was effective from January 17, 2003, through January 16, 2004. Stewart notified Leader that he had obtained the insurance, and continued paying the escrow payments for insurance and property tax until August 2003.
 {¶ 25} After Leader was notified that the insurance had been obtained, it cancelled the force placed insurance and charged Stewart's account only for the period *Page 7 
the policy was in place (September 25, 2002, until January 11, 2003). This amounted to $485, which exceeded the cost of the insurance policy that had been purchased for the previous year, even though the policy was in effect for less than four months. However, that was not Leader's fault. Stewart did not present any evidence that his prior agent with Spectrum had actually invoiced Leader or that the insurance was in effect from September 25, 2002, through January 17, 2003. Stewart also stated in his deposition that he did not provide Leader with proof of insurance between those dates. As a result, Leader did not breach the mortgage agreement by obtaining force placed insurance.
 {¶ 26} In August 2003, Stewart stopped paying the items in the escrow because it was "too much of a headache." Stewart Deposition, p. 83. Stewart was upset with the insurance agents and with Leader because he did not feel Leader was competent to handle his account. Stewart prepaid his property tax for the following year directly to the County Recorder, at a cost of $1,403.78. Stewart then wrote to Leader on August 11, 2003, to indicate that he would thereafter deduct 1/12 of the cost of the property tax and 1/12 of the cost of his hazard insurance ($538) from his monthly payments. By Stewart's calculations, the correct monthly payment for principal, interest, and MIP would be $485.64. Stewart then sent that amount in to Leader. In August, 2003, Leader reconciled the escrow account to reflect that the force placed insurance had been terminated, and this resulted in a projected surplus in the escrow account of $90.71.
 {¶ 27} In late September, 2003, Leader wrote to Stewart, stating that it had received $485.64 for the September 1, 2003 mortgage payment. Leader indicated this was not a full payment, that an additional $156.38 was due, and that it would hold the *Page 8 
payment until the balance due was received. On October 6, 2003, Stewart sent Leader a "Demand for Adequate Assurance of Due Performance." In this letter, Stewart accused Leader's representatives of being incompetent and stated that "when dealing with amateurs, one cannot be too careful." Stewart demanded that Leader apply his recent payments to principal, interest and MIP, and stated that if Leader failed to comply, he would suspend his performance under the agreement and quit making payments to Leader.
 {¶ 28} An assistant Vice-President for Leader, David Neuman, wrote to Stewart on October 17, 2003, and informed Stewart that Leader was required to maintain an escrow account for property taxes and hazard insurance because the loan was an FHA loan. Neuman indicated that Stewart's account had been credited with a $1,067 refund for the force placed insurance, and the new payment for insurance, taxes and MIP resulted in a total payment of $642.02 effective August 1, 2003. Neuman explained that since Stewart had continued to send an incorrect payment of $485.64 for the months of August through November, 2003, Leader's system had not been able to apply the money and advance the loan date.
 {¶ 29} In an attempt to resolve the matter, Neuman proposed that Leader accept the four short payments, advance the due date, and waive all accrued late fees, in exchange for the $625.52 then due to complete the August through November, 2003 payments.
 {¶ 30} Neuman's letter further indicated that Leader had contacted the Montgomery County Treasurer's office about the tax payment. Leader had paid the property tax bill and the County had received duplicate payments because of Stewart's *Page 9 
subsequent payment of the taxes. The County had posted Leader's payment first and said it could not refund Leader directly. However, the Treasurer's office advised that it would send Stewart the $1,404 refund if Stewart forwarded a letter to the Treasurer and included proof of payment.
 {¶ 31} Despite this communication from Neuman, Stewart did not pay the $625.52 that was due. Stewart also continued to deduct insurance and property tax from his mortgage payments.
 {¶ 32} In 2004, Leader merged with U.S. Bank, which acquired the note and mortgage in the merger. On repeated occasions during April, 2004, Stewart contacted representatives of U.S. Bank. Stewart was rude and screamed that he would pay whatever amount he decided to pay.
 {¶ 33} In June, 2004, a customer service representative of U.S. Bank responded to Stewart's inquiry about his loan, and informed Stewart that U.S. Bank could not accommodate his request to adjust his monthly mortgage payment because the guidelines that governed the FHA loan required U.S. Bank to maintain a tax and insurance escrow account throughout the entirety of the loan. Stewart was again informed in July, 2004, that he had been receiving late letters because he had not remitted the total payment due for principal, interest, and escrow. Stewart was told that U.S. Bank could not accept anything less than the total amount due for each monthly payment.
 {¶ 34} Stewart's failure to pay the full amount due on each monthly payment resulted in his eventual default under the terms of the note and mortgage. Based on the order of application of items under the terms of the mortgage, Stewart's monthly *Page 10 
payment eventually aggregated to less than 50% of the amount then due. In August 2004, U.S. Bank returned the partial payment remitted for that month, as Stewart was then below the aggregate 50% threshold. U.S. Bank mailed Stewart a demand letter in August 2004, indicating that he was in breach of the terms in the note and mortgage. The letter also informed Stewart that U.S. Bank intended to accelerate the loan and initiate foreclosure proceedings if the account was not brought current within thirty days.
 {¶ 35} Stewart did not transmit the amount requested. Instead, he continued to include the amount he felt he was required to pay, which was below the total amount charged for hazard insurance, property taxes, principal and interest, and MIP. On September 15, 2004, Stewart called the bank and made threats against the U.S. Bank representative and U.S. Bank, causing U.S. Bank to have safety concerns for its employees.[2]
 {¶ 36} On October 3, 2004, Stewart sent U.S. Bank another "Demand for Adequate Assurance of Due Performance." In this letter, Stewart stated that he would *Page 11 
quit making payments unless U.S. Bank provided assurance that it would apply his recent payments and all future payments to principal and interest. U.S. Bank responded, indicating that the loan was in default and due for the June 1, 2004 installment, because of the partial payments. The bank reiterated that it was required to collect all escrow items, and encouraged Stewart to contact the Default Administration Department to make proper arrangements to bring the loan current. Stewart did not make arrangements, and continued to remit partial payments through December 2004. These payments were not accepted. After Stewart was in default for a full three months, due to his refusal to include the entire amount of his payment, U.S. Bank filed the present lawsuit, seeking foreclosure. The trial court granted summary judgment to U.S. Bank on the foreclosure complaint and ordered that the property be foreclosed. Stewart appeals, pro se, from the judgment of the trial court, raising four assignments of error.
 II {¶ 37} Stewart's First Assignment of Error is as follows:
 {¶ 38} "WHETHER THE TRIAL COURT ERRED BY NOT GRANTING SUMMARY JUDGMENT TO THE APPELLANT WHEN THE UNDISPUTED FACTS SHOW THAT THE APPELLANT SUBSTANTIALLY COMPLIED WITH, AND THE APPELLEE MATERIALLY AND TOTALLY BREACHED THE PARTIES' MORTGAGE AGREEMENT."
 {¶ 39} Under this assignment of error, Stewart first contends that he completely complied with the mortgage agreement by paying his homeowner's insurance and property tax in advance. Stewart further contends that even if he did not completely *Page 12 
comply with the agreement, he substantially complied because he was simply doing what U.S. Bank would have done. And finally, Stewart argues that his actions were technical or trifling departures that were not sufficient to constitute a breach.
 {¶ 40} In the trial court, Stewart moved for summary judgment on various grounds, including upon the ground that he had substantially complied with the mortgage agreement. The trial court rejected application of the substantial compliance doctrine because it had not been able to find any cases applying the doctrine to real estate mortgage agreements.
 {¶ 41} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. FiveRivers MetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court. Broadnax v. Greene CreditService (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167, and Long v.Tokai Bank of California (1996), 114 Ohio App.3d 116, 119,682 N.E.2d 1052.
 {¶ 42} Like the trial court, we have failed to discover authoritative law applying the substantial compliance or substantial performance doctrine to real estate agreements, even though this contractual doctrine is generally well-established in Ohio. In Ohio Farmers' Ins.Co. v. Cochran (1922), 104 Ohio St. 427, 135 N.E. 537, the Ohio Supreme Court held that the "long and uniformly settled rule as to contracts requires *Page 13 
only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." Id. at paragraph two of the syllabus.
 {¶ 43} Cochran involved a property owner's failure to provide his insurer with proof of loss about a fire within sixty days, as required by the policy. The owner claimed that the insurer had waived formal notice and also contended that the main issue in the proof of loss related to the origin and circumstances of the loss. However, any delay in the process was attributable to the insurer, who had asked the state fire marshal to investigate the origin of the fire. In this regard, the Ohio Supreme Court noted that the owner was required by the proprieties:
 {¶ 44} "to await this independent investigation, rather than to press his demands for immediate payment, or to take any further steps upon his part essential to the formal proof of loss, to wit, the origin and circumstances of the fire, until the investigation is completed and a formal report made by the state authorities, who are acting at the instance of the insurance company." 104 Ohio St. at 432-33.
 {¶ 45} In addressing whether a breach had occurred, the Ohio Supreme Court noted that insurance contract law is basically like the law governing other types of contracts. The court stated that "[w]here there is substantial performance upon one side, there should be substantial performance upon the other side; and there is substantial performance upon one side when such performance does not result in any wrongful substantial injury to the other side." Id. at 434. In this regard, the court stressed that:
 {¶ 46} "The insurance company was the one that was pleading for delay, and not *Page 14 
the insured. Grant that the company's demand for delay was justified, it cannot thereafter be heard to complain that such delay, touching `the origin and circumstances of the fire,' brought about largely by itself rather than by the insured, had substantially injured it." Id. at 434-45.
 {¶ 47} Other Ohio cases have applied the doctrine of substantial performance in varying contractual contexts. See, e.g., Hansel v.Creative Concrete Masonry Constr. Co., 148 Ohio App.3d 53, 56-57,2002-Ohio-198, 772 N.E.2d 138, at ¶ 11 and 24. In Hansel, a contractor substantially performed under a contract to install a concrete driveway, where the driveway was clearly usable but showed some surface defects. The owner was not awarded the entire cost to replace the driveway, but was given a considerably smaller amount needed to repair the cracks. Likewise, in Kichler's, Inc. v. Persinger (1970), 24 Ohio App.2d 124,127, 265 N.E.2d 319, a contract was not substantially performed where bedspreads and furnishings were supplied, but were changed from the color and style specified by the buyer. However, no Ohio case has applied substantial performance to real estate mortgage agreements.
 {¶ 48} Some courts in other jurisdictions have rejected the substantial performance doctrine in the mortgage context. For example, in Gibson v. Neu (Ind.App. 2007), 867 N.E.2d 188, a mortgage agreement stated that the mortgagee would release its lien on property if the mortgagor was current in its payments when the property was sold. The trial court held that the mortgage should be released because the mortgagor had substantially complied by owing only $500 when the property was sold Id. at 194. The appellate court disagreed, finding that substantial performance did not apply because "timely payment of the debt was an essential condition of the *Page 15 
promissory note, mortgage, and release provision of the mortgage." Id. at 195. The court noted that it was constrained to apply the agreement the parties made, and it was "`not within the providence of this Court to make a new contract for the parties or to ignore or eliminate any provisions in the instrument.'" Id. (Citation omitted.)
 {¶ 49} Likewise, a Connecticut appellate court refused to apply the substantial performance doctrine where the defendants failed to make tax payments required by the terms of their note and mortgage. The court observed that these circumstances were not ones "under which the traditional contract principles of strict compliance should yield."Fidelity Bank v. Krenisky (Conn.App. 2002), 72 Conn.App. 700, 716,807 A.2d 968, 979. The court also stressed that "to allow mortgagors to make partial payments on their mortgages, and then avoid foreclosure by way of a claim of substantial performance, would result in the unsettling of the real estate market and an increase in litigation." Id.
 {¶ 50} In contrast, one court refused to foreclose where there was "a technical default due to a mistake or mere venial inattention and of no damage to the mortgage security or prejudice to the mortgagees."Murphy v. Fox (Okla. 1955), 1955 Okla. 1, 278 P.2d 820. InMurphy, the mortgagee brought a foreclosure action, claiming that the mortgagor had breached the agreement by failing to pay taxes before delinquency. The facts revealed, however, that the mortgagee had learned that the mortgagor had made an advantageous sale of part of the property to a third party. In order to set the sale aside and recover the property, the mortgagee took advantage of the fact that the mortgagor's bank had accidentally failed to pay the taxes on time. The mortgagee had also moved and concealed her whereabouts, even though she had said she would leave *Page 16 
a forwarding address. This was apparently done to prevent the mortgagor from making timely payments on the mortgage. 278 P.2d at 823-24.
 {¶ 51} These circumstances could easily have supported a finding of unconscionable conduct by the mortgagee, which is a generally accepted basis for deviating from the effect of an acceleration clause. Id. at 820. The court in Murphy noted, however, that some courts "go further" and "`relieve a mortgagor from the effect of the acceleration clause where the default was caused by an accident or mistake of the mortgagor acting in good faith, or under unusual circumstances beyond his control.'" Id. (Citation omitted). While Murphy does appear to apply a "substantial compliance" doctrine, later cases have interpretedMurphy to mean that "whether acceleration is permitted `depends on the conduct of the mortgagee and whether he has dealt fairly with the debtor or has acted oppressively or unconscionably.'" Greenberg v. ServiceBusiness Forms Industries, Inc. (C.A. 10), 882 F.2d 1538, 1542
(interpreting Oklahoma law). The Tenth Circuit Court of Appeals noted inGreenberg that this view is consistent with that of several other jurisdictions. Id.
 {¶ 52} Ohio does allow equitable doctrines to be applied in foreclosure cases. For example, the Ohio Supreme Court has applied the equitable doctrine of estoppel in a case involving a "due on sale" clause, which allowed the mortgagee to accelerate the loan or require additional interest where the mortgagor failed to obtain the mortgagee's consent to transfer of the property. Great Northern Sav. Co. v.Ingarra (1981), 66 Ohio St.2d 503, 507, 423 N.E.2d 128. See, also,e.g., County Sav. Bank v. Sain (Apr. 21, 1992), Franklin App. No. 91AP-380, 1992 WL 82794, *3 (holding that "the right to accelerate the note and foreclose the mortgage upon the violation of such a [due-on- *Page 17 
sale] clause is subject to the equitable defenses of estoppel and waiver") (bracketed material added); and Rosselot v. Heimbrock (1988),54 Ohio App.3d 103, 104, 561 N.E.2d 555 (stating that "mortgagee's unexplained failure to either inform the mortgagor that he intended to accelerate the note prior to his receipt of the mortgagor's two payments, or to return said payments and inform the mortgagor they were insufficient when they arrived, constitutes a waiver of mortgagee's right to rely on the default and the subsequent filing of his complaint to accelerate the mortgage").
 {¶ 53} The fact that equitable defenses are permitted in Ohio does not mean that mortgagors are absolved of responsibility for their own conduct, nor does it mean that acceleration clauses will not be enforced where the mortgagor defaults. In People's Sav. Assn. v. StandardIndustries, Inc. (1970), 22 Ohio App.2d 35, 257 N.E.2d 406, the Sixth District Court of Appeals stressed that:
 {¶ 54} "Acceleration clauses in mortgages are not new in Ohio. * * * In Coast Bank v. Minderhout, 61 Cal.2d 311, 38 Cal.Rptr. 505,392 P.2d 265, Justice Traynor, in a thorough opinion, held that a similar provision is a reasonable restraint designed to protect justifiable interests of the parties. We concur, and hold that a significant element in the mortgage contract is the mortgagor himself, his financial responsibility and his personal attitudes. The right of the mortgagee to protect its security by maintaining control over the identity and financial responsibility of the purchaser is a legitimate business objective and is not illegal, inequitable or contrary to the public policy of the state of Ohio." 22 Ohio App.3d at 38.
 {¶ 55} Similarly, the Sixth District stated in First Federal Sav. Loan Assn. of Toledo v. Perry's Landing, Inc. (1983),11 Ohio App.3d 135, 143, 463 N.E.2d 636, that: *Page 18 
 {¶ 56} "Mortgages, being voluntary security agreements incident or collateral to a primary obligation, are susceptible to the same rules of interpretation and the same framework of analysis which apply to contracts generally.
 {¶ 57} "* * *
 {¶ 58} "An approach consistent with freedom of contract recognizes the rights of parties to enter into binding mortgage agreements with full knowledge of the terms and conditions. Accordingly, the parties may contract as they please, so long as the resulting terms and conditions of the mortgage do not offend public policy and are not illegal."11 Ohio App.3d at 143.
 {¶ 59} The acceleration clause in the present case was not illegal, nor was it against public policy. Furthermore, even if we were inclined to adopt the doctrine of substantial performance in the real estate mortgage context (an issue we need not decide), Stewart's default was not a mere technicality resulting from mistake or inattention. Stewart unambiguously and plainly agreed in paragraph 2 of the Security Instrument to include provision for real estate taxes and hazard insurance premiums in his monthly payments. Stewart then deliberately chose not to pay the amounts specified under the agreement. He continued to make this choice in the face of repeated indications from the lender that his actions violated the terms of the mortgage. We also note that U.S. Bank and its predecessors had not breached the agreement when Stewart began subtracting the required amounts from his monthly payments. U.S. Bank, Leader, and NCM performed their part of the agreement by loaning a substantial sum to Stewart and did not breach the agreement prior to Stewart's unilateral decision not to pay as he had agreed. *Page 19 
 {¶ 60} As an additional matter, Stewart's breach was material. Because the mortgage was insured by FHA, U.S. Bank was obliged to follow HUD regulations, which require lenders to collect the monthly escrow amounts. Gibson v. First Federal Sav. Loan Assn. (D.C. Mich. 1973),364 F.Supp. 614, 615-616, citing Section 203.23(a), Title 24, C.F.R. Moreover, non-compliance with FHA mortgage servicing regulations "empowers the Secretary of HUD to impose a `civil money penalty, including a penalty under § 30.35(c)(2), or withdrawal of HUD's approval of a mortgagee.'" Wells Fargo Home Mortg., Inc. v. Neal (Md.App. 2007),398 Md. 705, 719, 922 A.2d 538, quoting Section 203.500, Title 24, C.F.R. Because the consequences to U.S. Bank for failing to comply with HUD escrow requirements could be severe, the escrow provision was an essential term of the Security Instrument.
 {¶ 61} The First Assignment of Error is overruled.
 III {¶ 62} Stewart's Second Assignment of Error is as follows:
 {¶ 63} "WHETHER THE TRIAL COURT VIOLATED THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE ITS GRANT OF SUMMARY JUDGMENT TO THE APPELLEE WAS FUNDAMENTALLY UNFAIR AND GROSSLY DISPROPORTIONATE WHEN THE UNDISPUTED FACTS SHOW THAT THE APPELLEE WAS NOT DAMAGED OR CAUSED DAMAGE TO ITSELF."
 {¶ 64} Stewart contends under this assignment of error that the trial court erred in granting summary judgment to U.S. Bank because U.S. Bank failed to prove damages. According to Stewart, a party must prove breach of contract and damages flowing from *Page 20 
that contract in order to recover for the breach. In this regard, Stewart contends that since he paid his property taxes and insurance premiums, U.S. Bank suffered no damage by his trivial breach or default.
 {¶ 65} We have already concluded that the breach was not trivial. Furthermore, the prayer for "`an ordinary decree of foreclosure and order of sale * * * is one for relief other than money.'" Natl. CityBank, NE v. Abdalla (1999), 131 Ohio App.3d 204, 210, 722 N.E.2d 130, quoting from Alsdorf v. Reed (1888), 45 Ohio St. 653, 17 N.E. 73, paragraph two of the syllabus. Therefore, U.S. Bank was not required to prove money damages in filing for foreclosure; it only had to prove that Stewart defaulted on his obligations under the agreement.
 {¶ 66} Section 9 of the Security Instrument provided, under "Grounds for Acceleration of Debt," as follows:
 {¶ 67} "(a) Default. Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:
 {¶ 68} "(i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment;
 {¶ 69} "(ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.
 {¶ 70} "* * *
 {¶ 71} "(c) No Waiver. If circumstances occur that would perm it Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events. *Page 21 
 {¶ 72} "(d) Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary."
 {¶ 73} As we noted earlier, Section 2 of the Security Instrument required Stewart to include amounts for principal, interest, hazard insurance, taxes, and MIP in his monthly payment. When Stewart failed to do so beginning in August 2003, U.S. Bank was entitled, under the terms of the security instrument, to accelerate the loan and file for foreclosure. However, the HUD regulations also contained additional requirements for foreclosure. In its decision granting summary judgment, the trial court found, and we agree, that U.S. Bank complied with all pertinent HUD regulations before foreclosing on the property. See Section 203.556, Title 24, C.F.R. (return of partial payments); Section 203.604(b), Title 24, C.F.R. (arranging face-to-face meeting with mortgagor or being excused from doing so because "mortgagor has clearly indicated that he will not cooperate in the interview."); and Section 203.606 (a) and (b), Title 24, C.F.R. (requirements for foreclosure, including that the borrower is behind in payment at least three full months).[3] *Page 22 
 {¶ 74} Accordingly, the Second Assignment of Error is overruled.
 IV {¶ 75} Because Stewart has combined the third and fourth assignments of error in his brief, we will follow the same format. Stewart's Third Assignment of Error is as follows:
 {¶ 76} "WHETHER THE TRIAL COURT VIOLATED THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY TAKING THE APPELLANT'S REAL PROPERTY WHEN IT APPLIED PROCEDURAL RULES IN A MANNER INCONSISTENT WITH THE LAW."
 {¶ 77} Stewart's Fourth Assignment of Error is as follows:
 {¶ 78} "WHETHER THE ACTION BELOW WAS ESSENTIALLY A SHAM PROCEEDING WHICH DENIED THE APPELLANT DUE PROCESS OF LAW UNDER THE UNITED STATES CONSTITUTION WHEN THE TRIAL COURT DENIED SUMMARY JUDGMENT TO THE APPELLANT AND GRANTED COMPLETE SUMMARY JUDGMENT TO THE APPELLEE ON UNDISPUTED FACTS THAT SHOWED THE APPELLEE WAS NOT DAMAGED, MATERIAL FACTS WERE NOT PUT INTO DISPUTE BY THE APPELLEE IN OPPOSITION TO THE APPELLANT'S MOTION FOR SUMMARY JUDGMENT, THE TRIAL COURT DID NOT DISPOSE OF *Page 23 
ALL OF THE APPELLANT'S CLAIMS AND DEFENSES, AND THE APPELLANT PUT INTO DISPUTE MATERIAL FACTS IN OPPOSITION TO THE APPELLEE'S MOTION FOR SUMMARY JUDGMENT."
 {¶ 79} In discussing these assignments of error, Stewart relies on theFifth and Fourteenth Amendments to the United States Constitution. Stewart generally contends that these amendments are violated when procedural rules are manipulated inconsistently with their usual application and effect a taking of property by the government. However, Stewart fails either to point out what procedural rules were violated or to explain how the government (presumably the trial court) has "taken" his property.
 {¶ 80} The right of property is considered a fundamental right.Norwood v. Horney, 110 Ohio St.3d 353, 363, 2006-Ohio-3799,853 N.E.2d 1115, at ¶ 38. Thus, "the federal and Ohio constitutions forbid the state to take private property for the sole benefit of a private individual * * * even where just compensation is provided." Id. at ¶ 43. In Norwood, the Ohio Supreme Court held that a city could not take an individual's private property under eminent domain and transfer the property to a private entity for re-development where there was no showing that the taking was for public use. Id. at ¶ 1 and 105.
 {¶ 81} No such situation is involved in the present case. The current proceeding is a mortgage foreclosure action, one of many that pass through the judicial process each year. We stressed in Foreclosure ofLiens for Delinquent Taxes v. Parcels of Land encumbered with DelinquentTax Liens, Clark App. No. 2002-CA-99, 2003-Ohio-1760, that: *Page 24 
 {¶ 82} "a mortgagee `has a legally protected property interest and is entitled, under the Due Process Clause of the Fourteenth Amendment, to actual notice reasonably calculated, under all of the circumstances, to apprise him of a pending tax sale and to afford him the opportunity to take appropriate action to protect his interests.'" Id. at 1} 6, quoting from In re Foreclosure of Liens (1992), 79 Ohio App.3d 766, 769,607 N.E.2d 1160.
 {¶ 83} There is no suggestion that Stewart has not received appropriate notice of a pending sale. In fact, the docket does not indicate that a sale has even been scheduled. Instead, only a foreclosure order has been filed.
 {¶ 84} In Grenga v. Bank One, Mahoning App. No. 04MA94,2005-Ohio-4774, the Seventh District Court of Appeals rejected a claim that a mortgagee and its officer had violated the Fifth andFourteenth Amendment rights of parties who had purchased property offered by the mortgagee at a judicial sale. In this regard, the court noted that the mortgagee and its officer:
 {¶ 85} "are private parties, not state actors. `Most of the protections for individual rights and liberties contained in the United States and Ohio Constitutions apply only to actions of governmental entities * * *' Thus, it is difficult to prove a violation of the Fifth
or Fourteenth Amendments where the defendant is a private citizen since those Amendments, `erec[t] no shield against merely private conduct, however discriminatory or wrongful.' * * * A private defendant cannot be liable for a constitutional deprivation unless that person can be described as a state actor." Id. at ¶ 82 (citations omitted).
 {¶ 86} The Seventh District observed that a state "`normally can be held responsible for a private decision only when it has exercised coercive power or has *Page 25 
provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" Id. at ¶ 83 (citation omitted). In resolving this issue, the Seventh District considered "`the extent to which the actor relies on governmental assistance and benefits, * * * whether the actor is performing a traditional governmental function, * * * and whether the injury caused is aggravated in a unique way by the incidents of governmental authority.'" Id. at ¶ 84 (citations omitted). After considering these points, the Seventh District dismissed the purchaser's complaint, stating that:
 {¶ 87} "Appellants' complaint does not give any basis for describing these private parties as state actors. Instead, it claims that they abused the process the state offered. Thus, Appellants are basically alleging that anyone who takes advantage of legal process is a state actor. This is clearly not the law." Id. at ¶ 85.
 {¶ 88} These statements equally apply to the present case. The fact that U.S. Bank initiated foreclosure does not indicate that "state action" was involved for purposes of the Fourteenth or Fifth Amendments. Likewise, the fact that the trial court granted an order of foreclosure does not mean that state action was involved for purposes of these amendments. The trial court simply considered a motion for foreclosure, granted summary judgment, and ordered foreclosure, as it has in numerous other cases.
 {¶ 89} As a final matter, we note that Stewart has the right to redeem the property prior to the time that a judicial sale is confirmed. See R.C. 2329.33. See, also, Hausman v. Dayton, 73 Ohio St.3d 671, 676,1995-Ohio-277, 653 N.E.2d 1190 (observing that "a mortgagor's right to redeem is `absolute and may be validly exercised at any time prior to the confirmation of sale'"). Accordingly, the Third and Fourth *Page 26 
Assignments of Error are overruled.
 IV {¶ 90} All of Stewart's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and GRADY, J., concur.
[1] RESPA is an abbreviation for the Real Estate Settlement Procedures Act of 1974, Section 2601 et. seq., Title 12, U.S. Code.
[2] In responding to U.S. Bank's summary judgment motion, Stewart did not deny these facts. Stewart also admitted during his deposition that he may have used profanity during his discussions with customer service representatives. Stewart's propensity for profanity and expletives was demonstrated in his deposition, where he referred to U.S. Bank and its representatives as "unethical," "lying slugs," and "incompetent," and to the attorney conducting the deposition for U.S. Bank as "brainless," "a lying slug," an "imbecile," and a "twit." See Stewart Deposition, pp. 61, 101, 112, and 133-34. Stewart also used more offensive descriptions, which we will not repeat here. Stewart alleged in an affidavit that he would have been willing to cooperate with U.S. Bank if it had attempted to arrange a face-to-face interview. The trial court found that the affidavit did not present credible evidence in view of Stewart's written statements to U.S. Bank that he had no intention of fulfilling his obligations under the mortgage. We agree with the trial court's conclusion.
[3] The trial court found, under the undisputed facts, that Stewart would not cooperate, and we agree with this conclusion. In addition to the facts already noted in our opinion, the trial court relied on many comments in Stewart's correspondence that indicated Stewart would not cooperate, such as ""Apparently you're hardheaded or just a bit slow * * * * * * You might want to have a lawyer explain to you what a trivial breach is and why you have not been damaged by my prepayment of last year's property taxes and this and last year's homeowner's insurance. Otherwise, good luck foreclosing as I will have complete defenses and claims against you for your continued harassment and possibly total breach." Summary Judgment Decision, pp. 23-24 (Doc. #99), quoting from July 8, 2004 Stewart Letter, attached as Defendant's Ex. 12 to Stewart Motion for Summary Judgment (Doc. #26). *Page 1